Carmeletta **PARKER** and Misty Parker, minors, by their next friend, Marilyn **PARKER**, Plaintiffs,

v.

**TRINITY HIGH SCHOOL; The Order of Dominican Sisters of Sinsinawa, Wisconsin; and The Board of Directors of Trinity High School, Defendants.**

No. 93 C 2318.

United States District Court, N.D. Illinois, E.D.

May 14, 1993.

---

Ellen G. Robinson, Fay Clayton, Robinson, Curley & Clayton, P.C., Chicago, IL, for plaintiffs.

Armand L. Andry, Law Offices of Armand L. Andry, John M. Kennelly, Kennelly & Associates, Oak Park, IL, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

### I. INTRODUCTION

This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1981, by three African–American citizens to secure rights to make and enforce educational contracts on the same terms as are enjoyed by white citizens. The parties do not dispute the jurisdiction of the court.

Plaintiffs, Carmeletta Parker and Misty Parker are students of defendant, Trinity High School ("Trinity"). The action is brought on their behalf by their mother, plaintiff Marilyn Parker. Trinity is operated as a private Catholic secondary school for women by defendant, The Order of Dominican Sisters of Sinsinawa, Wisconsin. The Board of Directors of Trinity High School is also named a defendant, but the members of the Board are not identified or individually named.

In the complaint and in a motion for a temporary restraining order and a preliminary injunction, it is alleged that on March 23, 1993, Carmeletta and Misty Parker engaged in a fight with another student as a result of which they were expelled. Carmeletta is a senior and scheduled to graduate on May 22. Misty is a freshman. Plaintiffs allege that they had unblemished records, that the school rules of discipline do not provide that fighting is a ground for dismissal, that the rules provide for other types of progressive discipline, and that white students have engaged in the same type of conduct, and more serious conduct, without being expelled. Plaintiffs sought a temporary restraining order.

A temporary restraining order is appropriate to maintain the status quo until a hearing can be held to determine whether or not a preliminary injunction should be entered pending a final determination on the merits. A temporary restraining order is intended to maintain the status quo for only a short period of time. Here it appeared that if a temporary restraining order were denied, the

expiration of time alone could well make the preliminary relief sought by the plaintiffs moot. Further, it did not appear that the incident which gave rise to the suit would be repeated in the short time needed to conduct a hearing or that the restraining order would prevent the defendants from enforcing the discipline imposed if preliminary relief was later denied. For these reasons, a temporary restraining order was granted requiring that the plaintiffs be returned to class pending a decision on the request for a preliminary injunction.

The temporary restraining order was conditioned on the plaintiffs Carmeletta and Misty Parker's good behavior and obedience to the rules of the school and the directives of the faculty. Defendants state that, in one instance, Carmeletta violated the restraining order by failing to obey an instruction from a teacher.

An evidentiary hearing was held on April 27 and April 29, 1993. Plaintiffs, Marilyn, Carmeletta and Misty Parker testified. Plaintiffs also called Amonicanetta ("Mona") Parker, a third-year student at Trinity and sister of Carmeletta and Misty Parker. Defendants called faculty members Cindy Romano, Alita Cozza, Rosemary Caragher, Marilyn Hosty, and Diana Pascarella. Trinity also called Catherine Brady, school secretary and dean of students from 1967 to 1992, Bridget O'Malley, assistant principal and dean of students, and Sister Jeanne Bessette, OSF, principal. Oral argument was heard on May 7, 1993.

Defendants deny that the discipline imposed on plaintiffs was racially motivated or more severe than that imposed on white students who engaged in equally serious conduct.

There are equities on both sides, and this is a difficult case.

## II. FINDINGS OF FACT

1. Trinity High School is a private Catholic High School for women. It is operated by a Catholic order of nuns, the Dominican Sisters of Sinsinawa, Wisconsin. Several members of the faculty testified about the school's long history in the education of women. Discipline is strict. Students are required to wear uniforms and to comply with rules of conduct that must be acknowledged in writing by both the student and a parent or guardian.

2. The Trinity High School Mission Statement is as follows:

Trinity is a Catholic high school that participates in the mission of the church to witness to the action of God in our world.

Trinity fosters the development of young women through religious education and a liberal arts college preparatory curriculum with opportunities for enrichment, advancement and personal growth.

In keeping with the Dominican tradition, Trinity promotes a life-long love, respect and search for truth and justice.

Within a value-centered learning community, Trinity nurtures a secure and respectful environment in which students prepare to take their place as leaders of society, church and family in the twenty-first century.

3. The Trinity Belief Statement is as follows:

We, the Trinity High School Community believe:

that each individual has a right to an education regardless of race, religion or nationality

that each individual is called to make and live out her faith and commitment

that a Gospel-centered environment provides opportunities for young women to experience God in their lives and to witness to the Word through community service

that faith, respect, service, social awareness and responsibility are fostered and developed in a Catholic school

that a single sex school uniquely promotes high academic achievement and provides opportunities to strengthen self-confidence and leadership skills

that the curriculum and activities of a school exist to challenge young women to develop to their fullest potential, as individuals, as Christians and as citizens

that continuing education is crucial to future opportunities

that learning is a life-long process which must extend beyond formal education.

4. Trinity accepts students who are not of the Catholic faith. The Parkers belong to a Pentecostal church. The student body is racially integrated. Although recent total enrollment has been declining, minority enrollment has been increasing. Total enrollment for the 1992–93 school year was 501. There are 339 (68%) caucasians, 92 (18%) African–Americans, 54 (10.8%) Spanish–Americans, and 16 (3.2%) Asian–Americans. The faculty is white.

5. The conduct which gave rise to the discipline at issue was as follows:

Sometime prior to March 23, Cina G. ("Cina"), a student at Trinity, dyed her hair. Carmeletta Parker was among students who made unflattering comments about Cina's hair. Cina returned the compliment by calling Carmeletta a vile name. On March 23, at about 3:00 P.M., Carmeletta Parker sought out Cina on the third floor of the school to discuss their differences. A faculty member, Ms. Romano, was nearby and heard angry words. She addressed both girls, telling them to settle down. Cina threw her books on the floor and approached Carmeletta. Both students ignored the teacher's direction to move away and discuss the matter. The students started to fight. Cina struck the first blow. The teacher stepped away to give her books and a camera to a student and then tried to step between the fighting students. She and the grappling girls moved across the hallway, and Ms. Romano was shoved up against a locker. The students were pulling each others' hair. They would not comply with repeated commands to separate.

Alita Cozza, another faculty member who came to assist, also commanded the students to stop and attempted to·pull them apart.

Diana Pascarella, a teacher, came to the assistance of the others and called for order.

Carmeletta began to release her hold first. Assembled faculty members grabbed both students.

In the meantime, Misty Parker came to the third floor. Ms. Romano turned to get her books and Misty Parker and Cina attacked each other. Misty and Cina pulled each others' hair. Ms. Romano tried to separate them and was clawed by Misty, who thought she was attacking Cina. When Ms. Romano told Misty that she was scratching her arm, Misty released Ms. Romano's arm.

Teachers Rosemary Caragher and Bill Frere joined the effort to control the fighting students. Ms. Caragher pulled Misty away, by holding her around the waist. As she pulled her away, Misty tried to reenter the fight and both Misty and Ms. Caragher fell to the floor.

Carmeletta started toward the fight between Misty and Cina but was blocked by Ms. Hosty. Carmeletta began flailing her arms, striking Ms. Hosty in the chin and upper body.

After the students were separated for the second time, verbal abuse continued. Mona Parker joined in with a verbal assault on Cina. Someone held Mona back.

The students were escorted to the office, each by teachers. Ms. Romano escorted Cina to the office. Misty Parker was escorted by Ms. Caragher. When Cina walked in, Misty had to be restrained by Ms. Caragher from attacking Cina. The verbal insults continued. At one point Misty reached for a statue or a vase in attempt to use it as a weapon or to throw it. Ms. Caragher intervened.

After the fighting students were accompanied to the office, another teacher gathered fallen jewelry and books and reassured students frightened by the exchange.

6. Ms. Romano suffered minor fingernail cuts on her arm. Ms. Caragher experienced leg bruises and a torn skirt. Ms. Hosty was hit on the chin and upper body.

7. Mrs. Parker was called to the school and the students were sent home. Mrs. Parker instructed the girls to apologize, which they did. That evening Carmeletta and Misty Parker each wrote letters to the school and faculty, apologizing for their conduct. Neither student has ever been seriously disciplined by the school. Marilyn Parker, her-

self a teacher in public schools, has enrolled four daughters at Trinity.

8. The Trinity methods of student discipline include counselling, probation, and suspension from school or from activities. The ultimate punishment is dismissal, with a student being asked to transfer to another school. The Student Directives 1992–1993, list distribution of illegal drugs and theft as grounds for dismissal. Student conduct and discipline is discussed as follows:

BEHAVIOR

Students are expected to treat faculty, staff and other students with courtesy and respect at all times. Therefore, fighting, stealing, loud or abusive language in school, on school property, or on the bus will not be tolerated.

DISCIPLINARY ACTION

If a student departs in a serious way from Trinity's student directives, her actions are subject to review by the Trinity Discipline Advisory Committee. The four forms of disciplinary action which the Committee may recommend are suspension, removal from a class, probation and dismissal.

Suspension may result in a student being sent home until a conference between parents and an administration can be arranged and the matter is resolved.

Removal from class may result in not being placed in another class.

Terms of probation will include the loss of privileges. Among them:

· Participation on school athletic teams or cheerleading squads
· Running for or holding any student office
· Membership in the National Honor Society
· Participation in any school social events
· Appearing in plays, reviews, etc.

Other terms will be individually determined.

Dismissal results in a student being asked to transfer to another high school.

To help our students develop an attitude of accountability for their actions, we believe that disciplinary guidelines are necessary. In establishing these guidelines, we recognize that not all situations can be handled in exactly the same manner. We strive for consistency as we work with students on matters of discipline.

A Trinity policy implementation guideline, dated December 1988 states with regard to discipline:

Working with students on matters of discipline may include individual discussion and counseling; involvement of students in defining acceptable behavioral standards; involvement of the student and the parent in cases where the student has repeatedly exhibited lack of responsibility or of self-discipline and/or if the matter under consideration is of a serious nature.

9. The decision to impose discipline on plaintiffs was made by Sr. Michelle Germanson, OP, President, Sr. Jeanne Bessette, OSF, Principal, and Ms. Bridget O'Malley, Assistant Principal. The action taken was stated in letters to the students issued March 29, 1993, as follows:

Dear Carmeletta & Mrs. Parker:

The fight occurred on Tuesday, March 23, 1993, at approximately 3:10 PM on the third floor of Trinity High School.

The hearing before the discipline board occurred on Friday, March 26, 1993, at 7:00 AM. The board gave their recommendation to the Administration who considered that recommendation and agreed with the following:

1) Carmeletta is expelled for the remainder of the fourth quarter of this school year 1992–93.

2) She will not participate or be present at any school functions (i.e. games, prom, graduation, mixers, etc.) If she does appear at the school, the police will be called.

3) She, her friends or her family will have no contact with Cina G[ ].

If Carmeletta is interested in obtaining a Trinity High School Diploma, she may do so if she does the following:

1) Completes her courses needed for graduation through correspondence courses (Loretto Extension form given to her.)

2) Attends counseling sessions (a minimum of 9 hours) in a program approved by

Ms. O'Malley, assistant principal of Trinity. These sessions must be given by a certified counselor and deal with conflict management, anger, and interpersonal relationships. Official notice of this needs to be presented to Trinity by the counselor.

3) Pays her tuition for the year 1992–93 through March 26, 1993, and pays $350 for the services of accepting her credits, processing her credits and arranging for her diploma during the fourth quarter.

4) These courses and counseling would have to be completed by August 15, 1993.

If Carmeletta chooses to graduate from Trinity, we need to know that by April 19, 1993.

If Carmeletta chooses to have her transcripts sent to another school, her tuition for 1992–93 must be paid through March 26, 1993.

Dear Misty & Mrs. Parker:

The fight occurred on Tuesday, March 23, 1993, at approximately 3:10 PM on the third floor of Trinity High School.

The hearing before the discipline board occurred on Friday, March 26, 1993, at 7:30 AM. The board gave their recommendation to the Administration who considered that recommendation and agreed with the following:

1) Misty is expelled for the remainder of the fourth quarter of this school year 1992–93.

2) She will not participate or be present at any school functions (i.e. games, prom, graduation, mixers, etc.) If she does appear at the school, the police will be called.

3) She, her friends or her family will have no contact with Cina G[ ].

If Misty chooses to return to Trinity High school for 1993–94, she will:

1) Complete her fourth quarter courses needed through Loretto Extension (form given to her.)

2) Attend counseling sessions (a minimum of 9 hours) in a program approved by

Ms. O'Malley, assistant principal of Trinity. These sessions must be given by a certified counselor and deal with conflict management, anger, and interpersonal relationships. Official notice of this needs to be presented to Trinity by the counselor.

3) Pay her tuition for the year 1992–93 through March 26, 1993, and pays $100 to Trinity for accepting her credits, processing her credits and completing her transcript.

4) Apply for readmittance to Trinity through an interview with Ms. O'Malley between August 1 and August 15, 1993.

5) Agree to be on probation for the remainder of her years at Trinity. Terms of this probation would include:

   1. No verbal fighting
   2. No physical fighting
   3. No bad language
   4. No detention, except for tardies.

   If any of these occur, she will appear before the Discipline Board.

If Misty chooses to have her transcript sent to another school, her tuition for 1992–93 must be paid in full through March 26, 1993.

We need to know by April 19, 1993 what her plans are for the fourth quarter.

10. Trinity High School does not retain records of student disciplinary actions after the student has left the school. Catherine Brady testified that during her period of administration there were about 40 to 60 dismissals and that 5 to 7 of those students were African–American. There have been no expulsions during the last four years according to plaintiffs.

11. Carmeletta testified that before she attended Trinity she visited the school one day with her older sister Tiffany, who is a graduate, and that she witnessed a fight between two white students in the cafeteria who were also ordered to stop fighting by a faculty member. No one was injured. She was told that the students were not dismissed.

12. It was recalled by Sr. Jeanne Bissette that a white girl was expelled after a first

offense of releasing a mouse at an assembly four years ago.

13. According to both Carmeletta and Misty, African–American students are disciplined more severely for talking in the library and in study periods. White students are given only a warning or reprimand, but African–American students are excluded from the library.

14. A recent incident involving the release of pepper gas (carried much like mace in a small pressurized cartridge) by two white students was related. The evidence supports a finding that the release was inadvertent. However, the school was closed for one or two periods. Two students, one of whom was apparently under other physical stress, were taken to a hospital by fire department paramedics who were called to check the ventilation system after the release. The gas was released near a kitchen vent. The students who were responsible for the incident were unknown to the administration. After an appeal by the administration, the students responsible came forward, identified themselves and apologized to the faculty and students. They were not expelled or dismissed.

15. Misty Parker testified that Ms. Romano made comments in class about racial tensions, mentioned that she was afraid of African–Americans and would not want to fight with an African–American.

16. Carmeletta Parker testified that the Gospel Choir director said that white girls should not participate because this kind of singing would be injurious to their voices. Carmeletta Parker also testified that Sr. Jeanne made a remark over the public address system about "enemies of Trinity" which she believed referred to the Parkers. Sr. Jeanne denied that such remarks were made. No such remarks were made.

17. Since the temporary restraining order was entered, the students have been subject to a condition of good behavior. Ms. Pascarella testified that during a class discussion Carmeletta was writing and was told to stop and listen. Another student, a white girl, was also writing. After each student continued to write, Ms. Pascarella took the papers away from them. Because of the content of Carmeletta's paper, Ms. Pascarella gave the letter to Ms. O'Malley and directed Carmeletta to see Ms. O'Malley. Ms. O'Malley testified that Carmeletta told her that the paper had been given to her by another student; that she was only reading it. At trial Carmeletta described it as a troubling dream that she was trying to deal with. The incident is not serious enough to be regarded as a violation of the temporary restraining order, but the different versions of the origin of the writing adversely affect the credibility of Carmeletta's testimony in this proceeding, particularly with respect to her recollection of other fighting.

18. The evidence offered by plaintiffs does not suggest any incident and discipline of white students similar to the events which occurred on March 23, 1993. The incidents cited by plaintiffs do not describe an assault started in the presence of a faculty member contrary to an order to stop, nor a fight that required physical restraint, nor a fight that resulted in injury to more than one faculty member, nor restarting a fight after it was forcibly stopped, nor restraint necessary to prevent the students from restarting a fight. This fight involved more than just the fighting students. The conduct was so violent and protracted that it frightened students and faculty members, and, according to faculty testimony, raised questions about the security of the students and the faculty.

19. The discipline imposed on Carmeletta Parker, one month before graduation, deprives her of the opportunity to participate in commencement exercises—a heavy penalty—but does not prevent her from obtaining a diploma from Trinity if she complies with the conditions imposed. The discipline imposed on Misty Parker would not prevent her from returning to Trinity High School, but she would be on probation for her remaining years—an unprecedented punishment, according to the evidence.

## III. CONCLUSIONS OF LAW

In order to obtain a preliminary injunction, plaintiffs must, as a threshold, show: (1) that they have no adequate remedy at law, (2) that they will suffer irreparable harm if the

injunction is not granted, and (3) some likelihood of succeeding on the merits in the sense that their chances are better than negligible. *National People's Action v. Village of Wilmette,* 914 F.2d 1008, 1010–11 (7th Cir.1990); *Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986); *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386–88 (7th Cir.1984). If the plaintiffs meet this threshold, the court then applies a "sliding scale" analysis, balancing the harm to the parties and the public from the grant or denial of relief and the likelihood of success on the merits. *Village of Wilmette,* 914 F.2d at 1011; *Roland Machinery,* 749 F.2d at 387. The sliding scale analysis is designed to minimize the costs of mistake in ruling on a preliminary injunction. *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir.1986). Therefore, the greater the showing of likelihood of success, the lesser need be the balance of irreparable harm, and vice versa. *Roland Machinery,* 749 F.2d at 387.

■ Mrs. Parker has sent all of her four daughters to the same Catholic grade school and to Trinity. Misty wishes to attend Trinity for the remainder of her high school years. Carmeletta is due to graduate from Trinity after almost four years of study. Plaintiffs have no adequate remedy at law and may, therefore, request injunctive relief.

■ Both students were expelled for the balance of the school term. The expulsion was, however, accompanied by certain terms and conditions which allow Misty to complete the quarter through an extension program and to resume the following year at Trinity. She would remain on probation for the remaining three years.

Carmeletta was also given the option of finishing her school work through an extension program. Although she would not be allowed to attend any graduation ceremonies, she was given the opportunity to earn her diploma from Trinity, in good standing, in time to matriculate with her class in college. Plaintiffs question the reasonableness of Trinity's assumption that Carmeletta could complete her last quarter of study and exams in a different system in time to receive her diploma by August 15, 1993. However, because these events occurred late in the term and both students were returned to class temporarily, their make-up efforts should be reduced.

Trinity's argument that the plaintiffs will not suffer irreparable harm because of the options given ignores the less concrete factors involved. Misty, Carmeletta and their parents want the particular education offered at Trinity. Misty would not only miss the last several weeks of her freshman year, but would continue with the burden of probation shadowing the remainder of her high school years.

Carmeletta's case presents more hardship. After four years of study, with an unblemished disciplinary record, Trinity's option would not allow her to associate with her classmates in the concluding weeks of school or to participate in any of the culminating graduation ceremonies. *See Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2659, 120 L.Ed.2d 467 (1992) ("Everyone knows that in our society high school graduation is one of life's most significant occasions."). Both Carmeletta and Misty have shown some irreparable harm.

It is not enough for plaintiffs to simply show some irreparable harm. Plaintiffs must also show some likelihood or more than a negligible likelihood of success on the merits. Section 1981, Title 42 U.S.C., as amended by the recent Civil Rights Act of 1991, provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, taxes, licenses, and exactions of every kind, and to no other.

(b) Definition

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modifications, and termination of contracts, and the enjoy-

ment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Section 1981(a) prohibits intentional discrimination against persons on the basis of race in the making or enforcement of contracts. "[M]aking and enforcing contracts" includes the performance, termination and the enjoyment of all benefits, privileges, terms, and conditions of private educational contractual relationships. *See The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989); *Albert v. Carovano*, 839 F.2d 871 (2d Cir.1987).

■ Only intentional, purposeful discrimination constitutes a violation of § 1981. At oral argument, plaintiffs argued that a general intent to act was sufficient for a § 1981 violation. Plaintiffs also argued that discipline which was not motivated by an intention to discriminate, nonetheless violated § 1981 if race subconsciously and unintentionally affected the school's disciplinary decision. Neither of plaintiffs' arguments are an accurate statement of the law. The law does not recognize, and plaintiffs have not cited authority for, the proposition that a defendant without a conscious intent can nonetheless be held liable for subconscious intent. *Compare Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment). Section 1981 prohibits "conduct motivated by a discriminatory purpose." *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386, 102 S.Ct. 3141, 3147, 73 L.Ed.2d 835 (1982). Section 1981 does not reach conduct which merely results in a disparate impact. *Id.* at 386, 389, 102 S.Ct. at 3147, 3149.

■ Discriminatory intent or motive may, however, be inferred from statistical or other evidence showing that minority students are disciplined more severely than white students for similar conduct. *See The Dartmouth Review*, 889 F.2d at 19; *McAles-*

*ter v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir.1988). Plaintiffs point to several instances of discipline which they contend indicate an intent to discriminate against African–Americans.

At the hearing, Mrs. Brady estimated the rates of expulsion and the numbers of those students who were African–American for the period 1967 to 1992. Mrs. Brady testified that during that period, an estimated 40 to 60 students were "asked to leave" and that of those students, five to seven may have been African–American. From 1971 to 1992, enrollment at Trinity has declined rather steadily, from approximately 1000 down to 500 students. During that period African–American and other minority enrollment has increased steadily from less than one percent to 31.8 percent this year.

Mrs. Brady's estimates of the numbers of African–Americans expelled as a percentage of all those expelled ranges from a little more than eight percent to over seventeen percent. African–American students comprised less than four percent of the student body prior to 1986 and from nine up to eighteen percent thereafter. Plaintiffs argue this data creates an inference that discipline, especially expulsion, is disproportionately meted out to African–American students. However, the imprecision [1] of Mrs. Brady's estimates and an inability to determine in which years the African–American students were expelled prevents drawing the inference urged by plaintiffs.

Carmeletta testified that she has seen or learned of at least three fights between white girls that she believes did not result in either expulsion or suspension. Specifically, Carmeletta testified that one fight in the lunch room had to be broken up by teachers and that the girls returned to school. For the reasons stated, Carmeletta's recollection of fights is not persuasive. Moreover, her descriptions do not establish similarity of the fights. In none of the three fights were teachers injured. None were resumed after the teachers intervened. Fighting, defendants concede, does happen in every high school. What makes the March 23 fight

---

1. Mrs. Brady's affidavit indicates that between 50 and 60 students were expelled.

"unprecedented," defendants argue, is that despite the known intervention of numerous teachers, the girls continued to fight, injuring teachers, continued to hurl verbal threats once separated, and attempted to continue the battle in the presence of the teachers not once but twice. Such blatant disregard for the authority of the teachers, defendants say, was the reason for the severity of the discipline. The meager credible evidence of fights between white girls is too dissimilar, without more, to draw a conclusion that different discipline has been accorded because of race. *See Dartmouth Review,* 889 F.2d at 20.

Plaintiffs point to a recent pepper gas incident to demonstrate that in situations where white students have injured other students, the school accepted the students' apologies and neither suspended nor expelled them. Both incidents, plaintiffs argue, represent unintentional incidents resulting in injury. In the pepper gas incident, however, both the students' acts and the resulting injury were unintentional. Although plaintiffs' injury to the teachers on March 23 may have been unintentional, their attempts to injure one another and repeated disobedience of the teachers' commands to stop were intentional. The pepper gas incident does not represent a similar, repeated disregard for the authority of the teachers. The incident and the discipline accorded simply does not, without more, create any inference of discrimination at this point.

■ As direct evidence of racial discrimination, Carmeletta testified that the leader of the gospel choir, whose members were all African–American, said that white students were not to join the gospel choir because it would hurt their voices. Misty testified that Ms. Romano had addressed the subject of racial tension with her class and that Ms. Romano had commented that she was afraid of African–Americans and would not fight an African–American girl.

Plaintiffs must show that those who determined the punishment improperly considered plaintiffs' race. Stray remarks by nondecisionmakers or remarks unrelated to the disciplinary decision process do not satisfy this burden. *Price Waterhouse v. Hopkins,* 490

U.S. 228, 277–78, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment). Although each teacher gave her account of the fight to the disciplinary board, none decided the appropriate discipline. Furthermore, Ms. Romano's version of the fight does not differ in material respect from Carmeletta or Misty's recollection. Therefore, the testimony does not support an inference that the disciplinary decision was either racially motivated or the result of racially biased accounts of the fight.

Plaintiffs point to the fact that the school's disciplinary guidelines prescribe a policy of progressive discipline and parental involvement, neither of which were used, to infer discriminatory intent. Plaintiffs also argue that the severity of the discipline was out of all proportion to the threat to the school. Defendants argue that they retain the discretion to apply discipline as they see appropriate. Plaintiffs do not disagree, but argue that a stereotype of black students as more dangerous than white students motivated the discipline in this case. Trinity acknowledges most public schools' problems of violence and threatened safety from students, undaunted by teachers' authority, and argues that it wants to avoid this situation. No inference of intent to discriminate can be drawn from Trinity's decision not to resort to progressive discipline or parent conferences. *Friedel v. City of Madison,* 832 F.2d 965, 974 (7th Cir.1987) (inconsistent application of rules at police training academy held not to be evidence of gender discrimination). This conclusion is supported by Sr. Jeanne Bissette's testimony that four years ago a white girl was similarly expelled, for a first offense, after she released a mouse during an assembly.

Plaintiffs have failed to meet their threshold burden of showing some likelihood of success on the merits. Although plaintiffs have adequately pleaded their case, Fed. R.Civ.P. 8(a), 9(b), this does not satisfy their burden. Even a negligible likelihood of success requires more than mere hope. This is not to say that, after adequate discovery, plaintiffs' case must necessarily fail before a jury. They have merely shown no reason they will succeed. *See Brunswick Corp. v.*

*Jones,* 784 F.2d 271, 274 n. 1 (7th Cir.1986) (even extreme irreparable harm would not justify preliminary injunction absent any likelihood of success). Since plaintiffs have not made a threshold showing, a preliminary injunction is not warranted. *See Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1374 (7th Cir.1989) (no likelihood of success); *see also Kellas v. Lane,* 923 F.2d 492, 493–94 (7th Cir.1990).

■ Even if plaintiffs had met their threshold burden, however, a preliminary injunction would not be granted under the sliding scale analysis. Trinity argues that it will suffer hardship out of all proportion to that suffered by plaintiffs if a preliminary injunction is granted. Trinity fears that the girls' return to the school would seriously jeopardize the atmosphere of discipline and security, impacting on all the students and faculty. Entry of a preliminary injunction would, Trinity argues, undermine the authority of the school to properly discipline its students and would effectively give the green light to similar behavior by other students. Certainly granting a preliminary injunction would have some effect, as has the temporary restraining order, on the perception and certainty of teacher authority.

On balance, the hardships imposed on plaintiffs by refusal to grant a preliminary injunction do not tip in favor of either plaintiff because neither has been deprived of the opportunity to receive a diploma from Trinity. They have not been dismissed and told that they must transfer to another high school. Nor does the balance tip in favor of plaintiffs once the likelihood of the success is included in the analysis.

Absent some evidence of racial motivation, the public interest is not served by this court's interference with Trinity's disciplinary decision. As the Supreme Court stated in the context of a procedural due process challenge to a public school expulsion, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.... [Students do not have the] right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of ... education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators ... and [the civil rights acts were] not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975); *accord Board of Educ. of Rogers, Ark. v. McCluskey,* 458 U.S. 966, 970, 102 S.Ct. 3469, 3471, 73 L.Ed.2d 1273 (1982).

Therefore, the harm to plaintiffs and their likelihood of success on the merits are outweighed by the harm to the school and its likelihood of success and the public interest effect of respect for discretionary school authority.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion for preliminary injunction [2] is denied. This court's temporary restraining order is hereby dissolved effective 5:00 p.m. May 14, 1993.

(2) Status hearing is set for June 2, 1993 at 9:15 a.m.