**Emily J. HELLER, Plaintiff,**

v.

**Duane HODGIN et al., Defendant.**

**No. IP96–701–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

June 11, 1996.

Daniel C. McCarthy, Greenwood, Indiana, for Plaintiff.

David R. Day, Johnson Smith Pence Densborn Wright & Heath, Indianapolis, Indiana, for Defendant.

*ENTRY DISCUSSING DENIAL OF
PRELIMINARY INJUNCTION*

BARKER, Chief Judge.

Plaintiff Emily J. Heller ("Plaintiff"), a senior at Lawrence Central High School ("Lawrence Central") has brought a claim against the Metropolitan School District of Lawrence Township ("MSD"), the district's board of education, the board's individual members, the district's superintendent and assistant superintendent, and the principal, assistant principal, and dean of students of Lawrence Central. Plaintiff alleges that her suspension from school following a verbal altercation with another student violated her constitutional rights under (1) the due process clause of the Fourteenth Amendment to the U.S. Constitution, (2) the equal protection clause of the Fourteenth Amendment, and (3) the freedom of speech clause of the First Amendment.

Plaintiff filed a motion for a preliminary injunction to prevent the defendants from requiring her to take her second-semester final examinations, for which she would not have had to sit but for her suspension. A school rule exempts second-semester seniors with perfect attendance and a C average from having to take final examinations. Plaintiff contends that her suspension might also hinder her chances of being accepted at a college of her choice or of obtaining student financial aid. The Court conducted a hearing on the preliminary injunction motion on May 21, 1996. In the course of the hearing, the Court orally granted Plaintiff's motion to dismiss the Complaint as to all defendants except MSD Assistant Superintendent of Schools Duane Hodgin, Lawrence Central Principal Caroline Hanna, Assistant Principal Mary Anne Burden, and Dean of Students Steve Hedrick (hereinafter collectively "Defendants"). At the conclusion of the hearing, the Court orally denied Plaintiff's motion for a preliminary injunction. Hereinafter, the Court sets forth its findings of facts from the evidence adduced at the hearing and gives in greater elaboration its conclusions of law denying the preliminary injunction motion.

I. *Factual background*

The disciplinary suspension that gave rise to Plaintiff's lawsuit followed an incident in the Lawrence Central High School cafeteria on February 29, 1996. Plaintiff, however, alleges that certain events preceding the caf-

eteria incident contributed to her suspension. In her testimony, Plaintiff stated that in January she was displeased to learn that the school intended to celebrate Martin Luther King Jr.'s birthday by inviting all minority students who ranked academically in the top quarter of their class to meet on February 16th for cake. Plaintiff testified that she spoke with Ms. Browner, an assistant principal, and told her that she believed the school's program for the King holiday discriminated against white students. Plaintiff testified that Ms. Browner denied there was any discrimination and justified the program as a way to celebrate Black History Month. When Plaintiff asked if white students would be served cake on President's Day, Ms. Browner said no and became irritated. Plaintiff also testified that she had conversations with Lawrence Central Principal Caroline Hanna ("Ms. Hanna") and Ms. Mary Anne Burden, assistant principal in charge of discipline ("Ms. Burden"), in which she also complained that some school teachers were not teaching students of different races equally. When Ms. Hanna and Ms. Burden asked Plaintiff to identify to whom she was referring, Plaintiff refused, telling them that it was not her role as a student to provide names.

Approximately one month later, on February 29, 1996, the cafeteria incident occurred. During lunch period that day, Erica Murraye, an African–American sophomore at Lawrence Central, cut into a lunch line in the cafeteria's serving area designated for seniors only. The senior student in front of whom Erica cut in line told Erica that she could not stand in the seniors' line. Plaintiff, from a farther distance away, called out a similar complaint to Erica. Erica, in response, pointed her finger at Plaintiff and called her a "white ass fucking bitch." A war of words ensued during which, at one point, Plaintiff retorted with a shout that she was not a "white ass fucking bitch." Plaintiff testified that although Erica attempted to escalate the name-calling into a physical confrontation, Plaintiff withdrew, refusing to fight. Three faculty members (or administrators) were in the cafeteria at that time supervising the lunch room. Mr. Frank Sergi, a social studies teacher ("Mr. Sergi"), was located only twelve to fifteen feet from the confrontation and heard the outburst; he specifically heard Plaintiff repeat Erica's profane epithet in a voice strong enough to be heard by the eighty or ninety other students in the cafeteria's serving area. Mr. Sergi radioed (by walkie-talkie) Assistant Principal Burden, another faculty member proctoring the lunch period, and asked her to come to the location of the two quarreling students. Ms. Browner, the third proctor also came to the scene. As Ms. Burden approached the scene, she discovered Plaintiff crying and appearing to be more upset than Erica. Ms. Burden took charge of Plaintiff, leaving Erica to the other faculty members, and directed Plaintiff to collect her belongings from the cafeteria and accompany her to the dean's office. At this time, Mr. Sergi informed Ms. Burden that Plaintiff had uttered obscenities. Over the heads of the students, Mr. Sergi mouthed to Ms. Burden the words, "She used the f-word." Ms. Burden testified that on the way to the dean's office, she and Plaintiff discussed the incident. Ms. Burden testified that Plaintiff recounted the incident to her and that Ms. Burden informed her that, if she had used the "f-word," she would be suspended for five days, but that, if she had not used the word, she would not be suspended. Plaintiff testified that she was very upset after the incident, but that she did not discuss the incident with Ms. Burden at all. The Court finds Ms. Burden's testimony on this point substantially more credible than Plaintiff's, especially since it appears much more likely that an upset high school student would want to explain why she was crying than that she would remain entirely quiet in the aftermath of all that had happened. After a wait outside the dean's office, Plaintiff spoke with the dean, Steven Hedrick ("Mr. Hedrick"). The two spoke for five minutes, Mr. Hedrick asking Plaintiff to explain to him what had happened. During their discussion, Mr. Hedrick informed Plaintiff that she would be suspended. When asked why, Mr. Hedrick told Plaintiff to speak with Ms. Burden. When Plaintiff found Ms. Burden, the assistant principal told Plaintiff that she would be suspended for five days beginning the following school day for having used the "f-word."

Plaintiff's mother, Mrs. Barbara Heller, had been waiting outside in her car to pick up her daughter after school. When Plaintiff came out, she told her mother that she was being suspended. The mother went into the school and spoke briefly with Ms. Burden as the assistant principal was heading to a meeting. Mrs. Heller decided to wait in order to speak with Ms. Burden following the meeting. During her wait, the mother spoke first with Mr. Sergi about Plaintiff's suspension, who told her that he did not know for certain whether Plaintiff had been suspended. Mr. Sergi did tell Mrs. Heller that he had heard her daughter shout an obscene epithet. Plaintiff's mother also happened upon Dr. Duane Hodgin, the school district's assistant superintendent of schools in charge of disciplinary matters ("Dr. Hodgin"). Their conversation lasted only briefly, the mother quickly describing again what she understood to have happened. Mrs. Heller testified that Dr. Hodgin assured her that Plaintiff had nothing to worry about. In his testimony at the hearing, however, Dr. Hodgin denied having made any such assurance. After Ms. Burden emerged from her meeting, she spoke with Mrs. Heller. Plaintiff's mother told Ms. Burden that her daughter had been the victim of a racial attack and asked the assistant principal why her daughter was being suspended when in fact she had declined to fight. Ms. Burden explained that Plaintiff was being suspended for having used the "f-word."

The following week, while Plaintiff was serving her period of suspension, her parents met for approximately half an hour with Principal Hanna and Assistant Principal Burden to discuss Plaintiff's suspension. The parents defended their daughter's conduct. Ms. Burden and Ms. Hanna said that Plaintiff clearly violated school rules against the use of obscenity. Plaintiff's mother testified that Ms. Burden commented on Plaintiff's "outbursts" in a way that suggested that the assistant principal was referring to incidents other than what had occurred at the cafeteria. At this meeting, the parents were given a written notice of suspension, which stated that Plaintiff was being suspended for use of an obscenity and that the suspension would extend for a period of five school days, begin-

ning February 29 and lasting through March 6. *See* Pl.'s Exhibit 1.

Plaintiff introduced into evidence excerpts from Lawrence Central's 1995–96 Student Services Handbook. *See* Pl.'s Exhibit 2. Page 11 of the handbook states that "[o]bscene language" is a major violation of acceptable student behavior. *Id.*, p. 11. Page 13 of the handbook states that the penalty for a major violation is based on two factors: (1) the degree of seriousness of the offense, and (2) the previous record of the student. *Id.*, p. 13. Prior to her suspension, Plaintiff had had no disciplinary infractions. At the hearing, the parties stipulated that Erica Murraye, the other young woman involved in the cafeteria incident, had an "extensive disciplinary history." Ms. Burden testified that the school suspended both Plaintiff and Erica, each for five days, on the grounds that, under the school's policy, a student is suspended for five days whenever she uses "fighting words." As it turned out, Ms. Burden was the faculty member who made the decision to suspend Plaintiff, while Mr. Hedrick was the one who made the decision to suspend Erica Murraye, although these two faculty members had discussed the penalties with one another before imposing them. Ms. Burden defended the penalty on the grounds that, in her mind, the "f-word" was patently obscene and the term "fighting words" included the "f-word," and that it was not inconsistent or unfounded to equate obscenities to "fighting words." Ms. Burden also stated that she, in fact, had considered Plaintiff's disciplinary record in determining the discipline to impose and that, while Erica Murraye had a more extensive disciplinary record, neither girl deserved the next higher level of punishment—a ten-day suspension.

The following facts regarding Plaintiff's allegations of impending irreparable harm were also elicited at the hearing. Plaintiff testified that she already has been accepted for admission to Ball State University in Muncie, Indiana, and that her applications for financial aid from Ball State and from Purdue University in West Lafayette, Indiana, also have been approved. While Plaintiff has not yet officially applied to Purdue, Plaintiff's mother testified that the Uni-

versity has expressed "active interest" in her daughter's application. Purdue has requested only that Plaintiff send some proof of her citizenship, which for reasons not explained at the hearing she has not yet submitted. Finally, Plaintiff stated that she long ago made up the class work that she missed during her suspension and that she has prepared to take her final examinations.

In Defendants' case in chief, Principal Hanna testified that a Lawrence Central student's disciplinary record is not reflected in her official transcript, nor is it transmitted in any other form to colleges or universities or future employers. Defendants introduced a copy of Plaintiff's official transcript, *see* Defs' Exhibit D, to demonstrate that Plaintiff's suspension is not recorded there. Ms. Hanna testified that a student's disciplinary history is kept in a separate file, never is sent to a college's or university's admissions office, and is destroyed upon a student's graduation. On cross examination, Ms. Hanna stated that she knew of no graduate of Lawrence Central who ever encountered difficulty in being admitted to college or in obtaining financial aid because of having been suspended. Ms. Hanna also noted that the student handbook listing obscenity as an major violation of acceptable student behavior is distributed to all high school students; Plaintiff did not dispute that she had received a copy.

## II. *Discussion*

■■■■ "The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1453 (7th Cir.1995). To prevail on a motion for preliminary injunction, the moving party bears the burden of establishing, as a threshold matter:

(1) that it has some likelihood of succeeding on the merits; and

(2) that it has no adequate remedy at law and will suffer irreparable harm if the injunction is denied.

*Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1453 (7th Cir.1995); *Vencor, Inc. v. Webb,* 33 F.3d 840, 845 (7th Cir.1994). If these two criteria are satisfied, the moving party then bears the burden of further establishing:

(3) that the injury to the moving party if the injunction is denied outweighs the harm to the non-moving party if the injunction is granted; and

(4) the public interest is best served by granting the injunction.

*Vencor, Inc. v. Webb,* 33 F.3d 840, 845 (7th Cir.1994); *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir. 1992). *See also Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1453 (7th Cir.1995) (if first criteria are satisfied, a court must then balance the harms to the parties and the public interest).

### A. *Likelihood of success*

Plaintiff has based her claim on alleged violations of the due process and equal protection clauses of the Fourteenth Amendment and of the freedom of speech clause of the First Amendment.

#### 1. *Due process*

The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court recognized that students facing temporary suspension from a public school have property and liberty interests that qualify for due process protection. The high court held:

[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story....

*Id.* at 581, 95 S.Ct. at 740. *See also Schaill by Kross v. Tippecanoe County School Corp.,* 864 F.2d 1309, 1323 (7th Cir.1988); *Lamb v. Panhandle Community Unit School District No. 2,* 826 F.2d 526, 528 (7th Cir.1987); *Baxter v. Round Lake Area Schools,* 856 F.Supp. 438, 443 (N.D.Ill.1994). The Supreme Court does not require any type of formal suspension hearing.

There need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.

*Goss,* 419 U.S. at 581–82, 95 S.Ct. at 740. *See also Lamb v. Panhandle Community Unit School District No. 2,* 826 F.2d 526, 528 (7th Cir.1987); *Baxter v. Round Lake Area Schools,* 856 F.Supp. 438, 443 (N.D.Ill.1994).

■ Applying these standards to the controversy at hand, it is clear that the faculty and administrators of Lawrence Central afforded Plaintiff more than sufficient notice that the use of obscenities at school was prohibited and that Plaintiff was being disciplined for having transgressed that rule. The school also afforded Plaintiff more than ample opportunity to present her side of the story and to argue against her suspension.

Plaintiff's notice began with the distribution of the school's student handbook, which states that Lawrence Central prohibits the use of obscenities and that their use is a major infraction of the rules of student behavior. *See* Pl.'s Exhibit 2. It appears altogether likely that, in accordance with her testimony, Ms. Burden informed Plaintiff of the nature of her transgression and of the discipline that might be imposed, as she accompanied Plaintiff to the dean's office directly following the incident. Even if we assume that no such conversation occurred during their walk to the dean's office, however, Plaintiff admitted that she spoke with Dean Hedrick in his office about the incident and that Mr. Hedrick specifically asked her to tell him what had happened. During their talk, Mr. Hedrick specifically informed Plaintiff that she was going to be suspended. It is clear, therefore, that Plaintiff fully understood that the incident in the cafeteria was the reason for her discipline. While Plaintiff testified that Mr. Hedrick did not tell her the technical grounds for the suspension, she admitted nonetheless that Mr. Hedrick told her to speak with Ms. Burden and that later that afternoon Ms. Burden, in fact, told her that her suspension was due to her having used an obscenity.

Plaintiff contends that the faculty members made their decision to suspend her before she was even told that obscenity was the grounds for the discipline. Even if this were true, the discipline did not take effect until the following school day. Plaintiff and her mother not only knew but had ample opportunity on the day of the cafeteria incident to argue against the suspension. Plaintiff's mother testified that she had spoken with Ms. Burden that afternoon and had argued that her daughter had been only an innocent victim of the other young woman's belligerence. Mrs. Heller also testified that Mr. Sergi had told her that he had heard Plaintiff use an obscenity in the cafeteria and that Ms. Burden specifically informed Mrs. Heller that she was suspending Plaintiff for having used the "f-word." There is no evidence that had the daughter's and the mother's arguments been persuasive, Ms. Burden would not have changed her mind.

Plaintiff's parents had another opportunity to meet with principal Hanna and assistant principal Burden the following week. Plaintiff's mother testified that she and her husband again had argued that Plaintiff had been an innocent victim of the other young woman's racial slurs. Ms. Hanna and Ms. Burden reiterated that Plaintiff's conduct presented a clear-cut violation of the school rule against use of obscenities. Clearly, the school gave both Plaintiff and her mother sufficient oral notice of the charges against Plaintiff, the evidence of the infraction, and an opportunity to present Plaintiff's side of the story. The Supreme Court's holding in *Goss v. Lopez* makes clear that the notice and hearing given to Plaintiff is all that the due process clause requires.

## 2. *Equal Protection*

In *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995), Chief Judge Posner outlined three types of equal protection cases, two common and one uncommon. The first involves charges of singling out members of a vulnerable group, racial or otherwise, for unequal treatment. *See City of Cleburne, Tex. v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). *See also Sherwin Manor Nursing Center, Inc. v. McAuliffe,* 37 F.3d 1216,

1220 (7th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 172, 133 L.Ed.2d 113 (1995) (a section 1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group). The second type of equal protection case, which according to Chief Judge Posner rarely succeeds nowadays, involves challenges to law or policies alleged to make irrational class distinctions. *See Lindsey v. Normet,* 405 U.S. 56, 74–79, 92 S.Ct. 862, 874–77, 31 L.Ed.2d 36 (1972). *Cf. Hassan v. Wright,* 45 F.3d 1063, 1068 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 128, 133 L.Ed.2d 77 (1995) (if a government classification relates to a proper governmental purpose, then the classification will be upheld; when reviewing a classification not pertaining to a fundamental right or a suspect class, "our review is limited to determining whether the statute is rationally related to legitimate legislative goals"). The third type of case involves action taken by the state, whether in the form of prosecution or otherwise, that is a spiteful effort to persecute the plaintiff, or to "get" her, for reasons wholly unrelated to any legitimate state objective. *Esmail,* 53 F.3d at 180. *Cf. Albright v. Oliver,* 975 F.2d 343, 348 (7th Cir.1992) (Posner, J.), *aff'd,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (to state equal protection claim, although plaintiff can be a member of a class with only one member, he must be singled out because of his membership in the class and not be just the random victim of governmental incompetence).

■ Plaintiff simply presents no evidence in this case sufficient to sustain an equal protection challenge to her suspension, under any of these three theories. First, we can quickly dispose of the second basis that Chief Judge Posner enumerated for finding an equal protection violation: there is nothing irrational in disciplining a student by imposing a five-day suspension for having violated a rule of student behavior or in defining the use of obscene language as contrary to acceptable behavior.

The other bases for an equal protection claim are equally unavailing. There is no evidence that school administrators singled out Plaintiff, either as a member of a particular class or as an individual. This conclusion holds even in light of Plaintiff's testimony regarding her prior encounters with school administrators over the Martin Luther King Jr. birthday celebration and over her complaint against teachers who allegedly engage in racial favoritism. There is ample evidence that Plaintiff was treated fairly. Plaintiff's suspension followed an incident in which Plaintiff clearly violated a school rule of student behavior. While it is not the role of the Court to decide on the wisdom of the school's anti-obscenity rule, the rule strikes the Court as highly appropriate and necessary in an educational environment where civility among teachers and students is surely as necessary for pedagogical purposes as it is laudable. Second, the other student involved in the incident received identical discipline. While the cafeteria incident may have been tinged with more than a little racial animus, the discipline meted out was not: each student—one white, the other black—received the same five-day suspension. Even had Plaintiff's punishment been more severe than the other student's, the fact that a different faculty member imposed each student's punishment would have served to insulate the school's actions both from the appearance of and the fact of any discriminatory or vindictive punishment.

■ Plaintiff next contends that, under the school guidelines on discipline, school administrators should have given Erica Murraye a more severe punishment because she had an extensive disciplinary history, in contrast to Plaintiff's completely unblemished disciplinary record. Ms. Burden, however, gave a reasonable explanation for why both students received the same punishment: neither student's conduct in this instance nor her respective disciplinary history, despite the difference between them, demanded a more severe punishment. Even if Plaintiff had presented evidence that school disciplinarians chose to ignore completely Erica's history, Plaintiff would be no closer to establishing an equal protection claim. Ms. Burden's testimony that a five-day suspension was appropriate as a sanction for use of an obscenity went unrebutted. Assuming that

Mr. Hedrick allowed Erica to get off lightly, such benevolence would not by itself make Ms. Burden's discipline of Plaintiff suspect, absent some evidence that Ms. Burden intended to discriminate against Plaintiff or to single her out because of race-based bias or plain vindictiveness.

Plaintiff's mother testified that during the meeting she and her husband had with Ms. Burden and Ms. Hanna, Ms. Burden spoke of Plaintiff's "outbursts" as if referring to incidents other than the one in the cafeteria. Ms. Burden testified, however, that the suspension was based solely on Plaintiff's conduct in the cafeteria, and not on any prior event or occurrence. Plaintiff invites the Court to assume otherwise, but the evidence and common sense more than support Ms. Burden's testimony. The Court will not infer an intent to discriminate against Plaintiff merely because Mrs. Heller was not sure what an assistant principal was referring to when she used the word "outbursts." It is clearly more reasonable to conclude that Plaintiff was suspended for shouting an obscene epithet, even if only to deny its truth, in a voice loud enough to be heard by ninety other students. Thus, Plaintiff's equal protection claim must fail.

### 3. *Freedom of speech*

■ Students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). They cannot be punished merely for expressing their personal views on the school premises unless school authorities have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 512–13, 89 S.Ct. at 789–40. The Supreme Court nevertheless has recognized that First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings," *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986), and must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S.

at 506, 89 S.Ct. at 736. A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school. See *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988), generally for a restatement of the above principles. Accordingly, in *Bethel School District No. 403 v. Fraser, supra*, the Supreme Court held that a student could be disciplined for having delivered a speech that was "sexually explicit," but not legally obscene, at an official school assembly, because the school was entitled to "disassociate itself" from the speech in a manner that would demonstrate to others that such vulgarity is "wholly inconsistent with the fundamental values of public school education." 478 U.S. at 685–86, 106 S.Ct. at 3165.

In *Fraser* the Court noted that the speech was given at a high school assembly held during school hours as part of a school-sponsored educational program in self-government and was attended by approximately 600 students, many of whom were 14 years old. 478 U.S. at 677–78, 106 S.Ct. at 3161. As the Court explained in the subsequent *Hazelwood* case, the circumstances of the speech, an official school program, implicated the question of the degree of authority educators have "over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570.

■ We believe, however, that *Fraser* stands for a somewhat broader principle that what the Court articulated in *Hazelwood*: namely, that some student language is not protectable speech regardless of the context in which it is uttered. As the high court stated in *Fraser*, "[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech ... would undermine the school's basic educational mission." 478 U.S. at 685, 106 S.Ct. at 3165.

■ The Ninth Circuit in *Chandler v. McMinnville School District*, 978 F.2d 524

(9th Cir.1992), found that *Fraser* stands for this larger proposition:

> *Hazelwood* focused on two factors that distinguished *Fraser* from *Tinker*: (1) the speech was "'vulgar,' 'lewd,' and 'plainly offensive,'" and (2) it was given at an official school assembly. Whereas both of these factors were present in *Fraser*, we believe the deferential *Fraser* standard applies when the first factor alone is present. * * * Therefore, school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to "substantially interfere with [the school's] work." Such language, by definition, may well "impinge[ ] upon the rights of other students," and therefore its suppression is "reasonably related to legitimate pedagogical concerns."

*Id.* at 529 (internal citations omitted). Whatever provocation Plaintiff may have experienced and regardless of whether she was repeating and returning words originally directed at her, Plaintiff's words were plainly offensive, even vulgar. This fact alone justified the school in disciplining her. In addition to being vulgar, Plaintiff's words were also clearly disruptive. In Ms. Burden's opinion, Plaintiff's words were "fighting words." Plaintiff testified that she was upset and in tears at the time when the faculty members intervened. Lawrence Central has legitimate, pedagogical interests in forbidding the use of language that incenses students to fight, either physically or verbally, with one another. The Court cannot say that the school's suspension of Plaintiff was wholly inconsistent with that interest. In short, Plaintiff's First Amendment argument is meritless.

### B. *Irreparable harm*

■ Having found that Plaintiff shows no likelihood of succeeding on the merits, the Court could cease its analysis, for Defendants have already demonstrated that Plaintiff cannot satisfy the requirements for receiving preliminary injunctive relief. The Court considers the issue of irreparable harm, however, because some of Plaintiff's claims of injury demand a response. We start by noting that Plaintiff already has served her suspension. The motion for a preliminary injunction is aimed at preventing the consequences of that suspension: namely, (1) the alleged diminution of her chances of being accepted at a college of her choice or of obtaining student financial aid, and (2) the requirement that she submit to second-semester final examinations.

As to the first alleged injury, Plaintiff failed to rebut Defendants' evidence that a student's suspension is never reflected in the student's academic transcript, but rather is kept in a separate disciplinary record that is never forwarded to colleges and is, in fact, destroyed at a student's graduation. Moreover, Plaintiff presented no evidence that her chances of being accepted into a college of her choice or of obtaining financial aid had been diminished in the slightest. Her allegation of injury is the crudest speculation. Indeed, the evidence at the hearing was directly contrary to her allegations. Plaintiff's applications for financial aid from Purdue and Ball State have already been approved. Plaintiff has been accepted for admission to Ball State, and Purdue is courting her, even though she has yet to apply there.

■ Plaintiff's contention that sitting for a final examination is punishment, even an irremediable harm, is similarly without merit. Sitting for a final examination is an integral part of schooling. While students may not enjoy studying or being tested, the examination itself may actually be a benefit—an opportunity to establish success in a particular course. Indeed, if a high school arbitrarily were to deprive some students of the opportunity to participate in examinations, those effected students most likely would have cause to complain and to seek some form of redress. Plaintiff presented no evidence of any harmful or injurious consequence, either from studying or sitting for the examination; the Court would not expect any to exist. The testimony at the hearing was that Plaintiff's grades achieved during this second semester were almost entirely A's and B's. There is no evidence that a poor performance on the examinations would lessen Plaintiff's chances of getting into a college of her choice. In addition, there is a clear absence

of evidence of any *irreparable* injury, that is, of any injury for which Plaintiff could not be compensated by monetary damages or other injunctive relief.

Plaintiff has completely failed to satisfy either of the first two threshold requirements for a grant of preliminary injunctive relief. The Court, therefore, need not balance the hardship between the parties or determine the public interest in granting or denying an injunction. Nevertheless, to put Plaintiff's motion in the proper context, the Supreme Court's admonition regarding the limited role a federal court should play in school disciplinary matters is worth reiterating.

> It is not the role of the courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have procedural rights while at school. But Section 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and Section 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975), *overruled on other grounds, Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See also Lamb v. Panhandle Community Unit School District No. 2,* 826 F.2d 526, 530 (7th Cir.1987); *Parker by Parker v. Trinity High School,* 823 F.Supp. 511, 521 (N.D.Ill.1993) (injunction would undermine the authority of the school).

### III. *Conclusion*

Having disposed of Plaintiff's constitutional arguments, we must conclude that what motivated this litigation was Plaintiff's firm belief that her suspension and its unfavorable consequences were unfair. We do not share Plaintiff's sense of injustice.

The evidence at the hearing, including Plaintiff's own testimony, suggests that Plaintiff's comportment in the cafeteria was entirely inappropriate. While Plaintiff cannot control the language and actions of others, she can and must attempt to control her own. Civility, self-restraint, and respect for one's peers are lessons to be both taught and learned as part of a properly structured education. They are virtues to be fostered by a civilized society and hopefully mastered by every graduate of every high school in the land. Plaintiff's education will be significantly advanced if, from all of this, she has learned all that this experience can teach her.

Plaintiff's motion to dismiss the Complaint as to all defendants except Duane Hodgin, Caroline Hanna, Mary Anne Burden, and Steve Hedrick is GRANTED. Plaintiff's motion for preliminary injunction is DENIED.

It is so ORDERED.