**Shaun DUNN and Bill McCullough, Plaintiffs–Appellants,**

v.

**FAIRFIELD COMMUNITY HIGH SCHOOL DISTRICT NO. 225, Defendant–Appellee.**

No. 98–1234.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1998.

Decided Oct. 15, 1998.

Alan C. Downen (argued), McLeansboro, IL, for Plaintiff–Appellant.

John B. Drummy, Eric D. Johnson (argued), Kightlinger & Gray, Indianapolis, IN, Timothy A. Klingler, Kightlinger & Gray, Evansville, IN, for Defendant–Appellee.

Before POSNER, Chief Judge, and CUMMINGS and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Shaun Dunn and Bill McCullough were both budding musicians who participated as guitar players in the high school band program at Fairfield Community High School, operated by the defendant Fairfield Community High School District No. 225. (We refer to them both as "Fairfield," as there is no distinction important to this appeal.) Fairfield prohibited its band members from departing from the planned musical program during band performances, and it specifically forbade guitar solos during the performances. In direct defiance of those rules and their teacher's explicit orders, Dunn and McCullough (along with two other students) played two unauthorized guitar pieces (instrumentals, with no words) at a February 10, 1995, band program. In due course, the discipline they received for this infraction caused them both to receive an "F" for the band course, and that "F" prevented McCullough from graduating with honors. This lawsuit under 42 U.S.C. §§ 1983 and 1988 followed. Dunn and McCullough have now

appealed from the district court's decision to grant summary judgment for Fairfield. While as a practical matter the school may have overreacted to the spectacle of two young musicians playing the "wrong" pieces, we conclude that its actions violated no right cognizable under the federal civil rights statutes, and we therefore affirm the district court.

## I

There is little more to the underlying story than the facts we have just outlined. During the 1995–96 school year, Dunn and McCullough were students at Fairfield and were enrolled in the Band class. One class requirement was to perform at various school-wide events, including home basketball games. Fairfield's grading policy for the Band class assigned a certain number of points to the different components of the course. That policy was prepared by the band instructor, filed with the school principal, and disseminated to each student in the class. It read as follows:

GRADING POLICY:

Every rehearsal, concert, etc. will be assigned a point value. Points will be awarded for presence at the event, appropriate dress, appropriate conduct, etc. Additionally, there will be at least two playing evaluations per quarter for points. The point scale will work as follows:

| | |
|---|---|
| Daily Rehearsal: | 5 points |
| Performances: | 20 points |
| Playing Evaluations: | 25 points |

The policy went on to warn that conduct at performances had to be professional and that conduct not meeting that standard would give rise to dire consequences:

Your conduct at performances is expected to be of the highest standard. We want to look, sound and be professional at all times—anything less is unacceptable. Performance conduct that is not of the highest standard will be dealt with severely. Possible disciplinary actions range from loss of all points for the performance to lowering of the final grade to dismissal from the band.

In the face of both these general warnings and more specific admonishments from both School Principal Rena Talbert and Band Director Charlotte McGill, Dunn and McCullough decided to play their unauthorized guitar songs at the February 10, 1995, band performance during a home basketball game. As they were doing so, McGill was shouting at them to stop, but they ignored her. Dunn and McCullough both testified in their depositions that they realized the songs were *verboten* and that they expected some form of punishment. McCullough explained the action as a form of protest against the school's rumored decision to remove guitars from the band.

When punishment came, it was far more severe than either student had anticipated. It began on February 13th with McGill's decision not to award them any performance points for the February 10 event. Matters did not stop there, however. McGill evidently referred the matter to Principal Talbert, who decided that Dunn and McCullough had been guilty of disrespect to faculty and staff, which was a Classification III, subparagraph A6 violation of school rules. (Fairfield classified student misconduct into three categories, with Classification I being the most serious and Classification III the least. A student committing a Classification III offense could be removed from class for either academic misconduct (*e.g.*, failure to complete homework) or nonacademic misconduct (*e.g.*, possession of tobacco products).) As a penalty, Talbert decided to remove the two students from Band class for the remainder of the school year and to prohibit them from attending any more home basketball games for that year.

Because of the way the grading policy operated for Band class, this proved to be an exceptionally severe penalty. The prohibition against attending class meant that Dunn and McCullough could not earn any class points for the rest of the year, nor could they earn performance points or evaluation points. Not surprisingly, the number of points they had earned up until the ill-fated February 10 performance was not enough to carry the day for them, and so both received final grades of "F" for the course. Both students graduated, although as we noted above, the "F" in Band prevented McCullough from doing so

with honors, and the briefs inform us that both are now attending the Atlanta Institute of Music and hope eventually to have a career in music.

## II

The students' complaint alleged that Fairfield had violated their constitutional rights in two ways: first, that it violated their "right to substantive due process ... by imposing disciplinary measures unrelated to academic conduct and ... outside the parameters and intent of the Illinois School Code and [Fairfield's] disciplinary policy," and second, that it violated their Eighth Amendment right to be free of cruel and unusual punishment when it imposed the disciplinary measures. In essence, they claimed that Fairfield had transgressed the Constitution when it imposed the drastic measure of expulsion from class, knowing that it would inevitably lead to a failing grade in the course, for one single disciplinary incident. The district court rejected the students' contentions, noting also that they had failed to address the Eighth Amendment component of their case in their summary judgment motion. (They have abandoned this argument on appeal; we therefore do not consider it further.) The disciplinary action in question, the court concluded, bore a rational relation to the school's interest in maintaining order and providing an education. The court also commented in a footnote that if the plaintiffs were to prevail, "[a]lmost every disciplinary action could become a federal case." The court then considered the students' claim that Fairfield had violated Illinois state law. Because the complaint did not invoke the court's supplemental jurisdiction under 28 U.S.C. § 1367, the court expressed doubt that the claim was properly before it. In any event, the court decided that the undisputed facts showed that no violation of Illinois law had taken place, citing 105 ILCS 5/24–24, 5/10–20.9a.

## III

Even though the students are entitled to this court's *de novo* review of the summary judgment for Fairfield, this generous standard cannot salvage their case. The fundamental flaw in their theory of the case arises from their failure to appreciate the difference between the procedural protections afforded by the Fourteenth Amendment against state deprivations and the far more limited substantive standards that Amendment imposes on state actors. If this had been a case (as it is not) in which Dunn and McCullough had complained that Fairfield threw them out of Band class and effectively condemned them to an "F" in the course without giving them some kind of notice and a hearing, we would delve into the nature of the property interest Illinois law creates in a public education. Assuming a protectible interest exists (as it undoubtedly does, see *Osteen v. Henley*, 13 F.3d 221, 224–26 (7th Cir.1993); *Betts v. Board of Education of the City of Chicago*, 466 F.2d 629, 633 (7th Cir.1972); *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1st Cir.1988); *cf. Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)), we would then assess Fairfield's procedures under the standard framework described in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

But that is not the students' claim. Instead, they assert that the federal Constitution places substantive restrictions on the type of disciplinary measures public school districts may use for conceded violations of rules of student conduct. At some extreme, that is certainly true; the question here is where the outer boundaries lie. The students seem to think that federal constitutional protection is co-extensive with the right recognized under Illinois law to a free public education through the end of high school. The Supreme Court's recent decision in *County of Sacramento v. Lewis*, —— U.S. ——, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), definitively shows that they are wrong. *Lewis* involved a far more serious deprivation than anything Dunn or McCullough suffered: 16–year–old Philip Lewis was killed by a police officer during the course of the officer's high-speed pursuit of the motorcycle Lewis was riding as a passenger. Lewis's parents sued under § 1983, claiming that Lewis had been deprived of his life in violation of substantive due process. In other words, they alleged that no matter how much procedure the state used, it was

simply not entitled under the federal Constitution to allow its agents to engage in such risky, reckless behavior. *Cf. Wudtke v. Davel,* 128 F.3d 1057, 1062–63 (7th Cir.1997) (discusses difference between substantive and procedural claims).

The Supreme Court rejected the Lewises' claim in an opinion that emphasized once again how limited the scope of the substantive due process doctrine is. See *Washington v. Glucksberg,* 521 U.S. 702, ——, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) (explaining that "we 'ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended'") (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *Albright v. Oliver,* 510 U.S. 266, 271–72, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (same). In so doing, it relied on two independent grounds: first, that substantive due process does not apply when a particular part of the Constitution "provides an explicit textual source of constitutional protection against a particular sort of government behavior," *id.* at 1714, quoting from *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and second, that "in any event the allegations are insufficient to state a substantive due process violation through executive abuse of power." —— U.S. at ——, 118 S.Ct. at 1714. We turn to the latter part of the Court's opinion, because no one claims that Fairfield's actions should be judged under a more specific part of the federal Constitution.

The touchstone of due process, the Court explained, is "protection of the individual against arbitrary action of government," *id.* at 1716, quoting from *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), whether the problem is the denial of fundamental procedural fairness or the exercise of governmental power without any reasonable justification. The criteria that govern what is fatally arbitrary in the latter cases depend upon whether legislation or a specific act of a governmental officer is at issue. In *Lewis,* the focus was on the specific act of a governmental officer, and in those cases, the Court said that "only the most egregious official conduct" is arbitrary in the constitutional sense. *Id.* at 1716. At least since *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Court has looked for an abuse of power that "shocks the conscience"; it reaffirmed that benchmark in *Lewis.* Looked at from the opposite point of view, the Court reiterated that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 1717. Negligent conduct can virtually never meet the constitutional threshold. Instead, the Court said, "conduct intended to injure in some way unjustifiable by *any* governmental interest" would be most likely to rise to the conscience-shocking level. *Id.* at 1718 (emphasis added). In the (literally) fast-moving and fluid situation faced by a police officer on the street, the Court found that "even precipitate recklessness fails to inch close enough to harmful purpose" for purposes of substantive due process analysis. *Id.* at 1720. It therefore found that the Lewises' complaint on behalf of their deceased son did not state a constitutional claim.

One is tempted to say that if a police officer's "precipitate recklessness," which caused the deprivation of someone's life, was not sufficiently shocking to satisfy substantive due process standards, then it would be nearly absurd to say that a school principal's decision effectively to give two students an "F" in Band class did. It may be worth acknowledging that this in no way necessarily implies approval of the state official's action; we are certain that no member of the Supreme Court thought in hindsight that the police officer in *Lewis* had responded prudently to the young motorcycle speeders, and we may have similar doubts about the wisdom of the severity of Fairfield's sanctions against the rebel musicians here.

Although the briefs are not entirely clear on this point, we understand from oral argument that Dunn and McCullough are also asserting a legislative violation of substantive due process rights, insofar as they are attacking Fairfield's written disciplinary classifications and penalty structure. In *Glucksberg,* the Court reaffirmed that "[t]he Due

Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." 521 U.S. at ——, 117 S.Ct. at 2267. The substantive component of the clause, the Court explained, "provides heightened protection against governmental interference with certain fundamental rights and liberty interests," including things like the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to choose an abortion. *Id.* (giving examples of each). Once again, measured by that standard the school policy that the students attack comes nowhere close to a constitutional violation. Although students may have some substantive due process rights while they are in school, see *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), education itself is not a fundamental right, see *San Antonio Indep. Schl. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). That means that Fairfield's decision to stack the deck so that these students would fail Band must be sustained unless it is wholly arbitrary. Here, however, Dunn and McCullough freely conceded that they had violated a school rule, that the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district. That alone is enough to show that their claim cannot possibly succeed. The Constitution does not guarantee these or any other students the right not to receive an "F" in a course from which they were excluded because of misbehavior.

The students also conceded at oral argument that they were asking the federal courts to undertake review of school disciplinary decisions analogous to the review furnished by the federal Administrative Procedure Act for agency action, in which the courts would set aside any school disciplinary decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). If we were to equate the meaning of the terms "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in the APA with the constitutional standard for substantive due process, we would be flying in the face of the Supreme Court's clear instruction that substantive due process on either the legislative or the executive side requires an extraordinary departure from established norms. On a practical level, we share the district court's concern about transforming the federal courts into an appellate arm of the schools throughout the country, but this is not a "floodgates" inspired decision. Our conclusion that Dunn and McCullough have not stated a claim under the substantive component of the due process clause of the Fourteenth Amendment rests exclusively on our understanding of the scope of that doctrine as it has been explicated by the Supreme Court.

For these reasons, we AFFIRM the judgment of the district court.