78 F.Supp.2d 812 (2000)
Roosevelt FULLER, by his parents Gretta Fuller and Roosevelt Harris, Gregory Howell, by his parent Cynthia Howell, Terence L. Jarrett, by his parent Marilyn Jarrett, Errol Bond, by his parent Delphine Bond Kendrex, Shawn Honorable, by his parent Eureka Honorable, and Courtney Carson, by his parent Rinda M. Carson, Plaintiffs,
v.
DECATUR PUBLIC SCHOOL BOARD OF EDUCATION SCHOOL DISTRICT 61, Superintendent Kenneth Arndt, School Board President Jacqueline Goetter, and School Board Members: Terry Robinson, Jan Mandernach, Michael Setina, Phillip Wilhelm, and D.R. Roberts, Defendants.
No. 99-CV-2277.
United States District Court, C.D. Illinois, Danville/Urbana Division.
January 11, 2000.
*813 *814 Ralph E. Williams, Springfield, IL, Lewis Myers, Jr., Andre M. Grant, Chicago, IL, Berve M. Power, Chicago, IL, Mark A. Lyon, Chicago, IL, for plaintiffs.
Thomas W. Kelty, Michelle L. Proctor, Kelty Law Offices, P.C., Springfield, IL, Michael C. Bruck, Michael T. Beirne, David M. Jenkins, Melissa M. Riahei, Quinlan & Crisham, Ltd., Chicago, IL, for defendants.

ORDER
McCUSKEY, District Judge.
On November 30, 1999, Plaintiffs Roosevelt Fuller, Gregory Howell, Terence Jarrett, Errol Bond, Shawn Honorable and Courtney Carson (students) filed their First Amended Complaint (# 29) against Defendants, Decatur Public School Board of Education School District 61 (School Board), Superintendent Kenneth Arndt, School Board President Jacqueline Goetter, and five members of the School Board. The students brought their First Amended Complaint pursuant to 42 U.S.C. § 1983. The students sought declaratory and injunctive relief, essentially seeking an Order reinstating them in school. A trial was held on December 27, 28, and 29, 1999.
The students in this case argue that they were expelled by the School Board for a period of two years because of a "zero tolerance" policy which punished them as a group, denied their constitutional rights and was racially motivated. The students additionally argue that they were stereotyped as gang members and racially profiled by the actions of the School Board. The students claim that, because the fight was of a short duration and that no guns, no knives, and no drugs were involved, no expulsion was warranted for their actions in the fight.
After reviewing the evidence presented at trial, this court finds that the students have failed to meet their burden of proof on all issues presented and are not entitled to a declaratory judgment or injunctive relief. The court further finds that the School Board did not act illegally, improperly or deny the students their constitutional rights. The School Board's expulsion of the students will stand.
At the outset, this court wants to emphasize that the students in this case were involved in a violent fight in the stands at a high school football game. None of the students testified at trial and they have never denied their involvement in the fight. This court observed from the video-tape presented at trial that the fight involved many individuals raising havoc in the midst of a captive audience of football fans, which included parents, grandparents, teachers and children. Because of the violent nature of the fight, a portion of which was captured on videotape, approximately one-half of the spectators in the bleachers scattered and left the stands to avoid confrontation and possible injury. It is undisputed that seven spectators, six students and one adult, filed accident reports at MacArthur High School following the incident. These reports showed that a 15-year-old female student stated that people landed on her during the fight and when she got up to run she was kicked down by a person involved in the fight and heard her back pop. A 15-year-old male student complained that he was struck in the left cheek and suffered a contusion to his face. In short, this court is not impressed with the students' position that because no knives or guns were used in *815 the melee that it was not a significant fight. Just because no weapons other than fists and feet were used by the students does not mean that innocent bystanders were not harmed, frightened and forced to flee the stands to avoid serious injury.
This court firmly believes that the citizens and students of Decatur should be able to go to a high school football game and watch the contest on the field without worrying about a violent confrontation erupting in the stands which could engulf them in the conflict. If the School Board had failed to take action against these students or otherwise ignored their conduct at the game, the students who were not involved in the fight, as well as the citizens of Decatur, might be led to believe that the School Board was unable to control conduct in the schools.
It is also important to recognize that the Seventh Circuit Court of Appeals recently noted that the Supreme Court "`has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" Boucher v. School Bd. of School Dist. of Greenfield, 134 F.3d 821, 827 (7th Cir.1998) (quoting Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).
This court has carefully considered each of the claims raised by the students in their First Amended Complaint. The court first concludes that each student received notice of a hearing before an independent hearing officer and before the School Board. Also, each student received a separate hearing before the hearing officer and had an opportunity to appear and present witnesses. Further, each student had a hearing before the School Board and had the opportunity to address the School Board. Accordingly, this court concludes that the students' procedural due process rights were not violated.
Second, this court concludes that the students did not present any evidence which established that the School Board's decision to expel them for engaging in violent behavior was in any way based upon race. The students' evidence consisted solely of statistics which were complied during the course of trial and did not exist prior to trial. These statistics failed to establish that any similarly situated Caucasian students were treated less harshly. Further, Jeffrey Perkins, one of the African American members of the School Board, was called as a witness by the students. Perkins was questioned about the School Board's decision in this case and said that he could not testify that race was "an issue in the decision to expel."
Third, this court concludes that the students completely failed to establish that the School Board had a "zero tolerance policy." The evidence showed that, on August 25, 1998, the School Board adopted a resolution which declared a "no-tolerance position on school violence." However, the evidence presented by the students' own witnesses showed that this resolution had no impact on student disciplinary cases. Perkins testified that he did not recall any discussion by the School Board about the resolution during any expulsion hearings. Dr. Walter Amprey, the students' expert witness, testified that he reviewed the documents related to the discipline of these students and did not recall ever seeing the term "zero tolerance."
Finally, the court concludes that the students cannot challenge the provision prohibiting "gang-like activity" as void for vagueness. The evidence presented before the hearing officer showed that an incident occurred on September 3, 1999, between two members of rival gangs, the Vice Lords and the Gangster Disciples. The evidence further showed that the fight on September 17, 1999, was a continuation of this conflict and was a fight between members of these two rival gangs. Based upon this evidence, the hearing officer and the School Board could properly find that the students violated the prohibition against "gang-like activity." Moreover, *816 the students were found to have violated two other rules: the rule prohibiting physical confrontation or violence and the rule prohibiting acts that endanger the well-being of students, teachers or other school employees. The students' conduct clearly violated these rules. The violation of these two rules standing alone would form a sufficient basis for the School Board's expulsion of these students.
This court will now set forth a detailed analysis of the facts of this case, the claims raised by the students and the law supporting the court's decision.

FACTS
The following facts are summarized based upon the testimony the court heard at trial and the joint exhibits which the parties stipulated into evidence. The joint exhibits consisted of all of the documents presented to the independent hearing officer, a transcript of the hearings before the hearing officer, the hearing officer's reports and the records from the relevant School Board meetings.
Roosevelt Fuller (Fuller) and Errol Bond (Bond) were students at Stephen Decatur High School; Gregory Howell (Howell) and Shawn Honorable (Honorable) were students at Eisenhower High School; and Terence Jarrett (Jarrett) and Courtney Carson (Carson) were students at MacArthur High School. All three high schools are located in Decatur, Illinois, and are part of Decatur Public School District No. 61 (District). On Friday, September 17, 1999, a football game was held at Eisenhower High School between Eisenhower and MacArthur High School. Approximately six minutes into the third quarter of the game, a fight broke out in the bleachers on the east end of the football field, the bleachers where fans of MacArthur were sitting. Both Ed Boehm (Boehm), principal at MacArthur, and Walter Scott (Scott), principal at Eisenhower, were present at the game. Boehm testified that the bleachers on the east end were pretty close to being full of spectators, including students, parents, teachers and grandparents. Boehm said the fight started on the north end of the bleachers and traveled all the way to the south end. Because of the fight, the spectators in the east bleachers were scrambling to get away. Boehm said he saw fans "jumping over the rail, coming down trying to get onto the track" and "running up the bleachers trying to get away." According to Boehm, when the fight was over, the bleachers were approximately one-half full. Boehm testified that spectators who were in the east bleachers during the fight expressed fear, stress and turmoil when he talked to them after the fight. Boehm stated that he had never seen a fight of this magnitude in his 27 years in education.
Gary J. Hunt (Hunt), director of human resources for the District, also testified that he was present at the game. He was sitting near the top of the east bleachers when he observed the fight going on below him. Hunt testified that the fight started at the stairwell near the north end of the bleachers and proceeded into the bleachers where it moved along the bleachers from the north end to the south end. He saw people running out of the stands and up the bleachers to get away from the fight. After the fight ended, Boehm and Hunt were following three students suspected of being involved in the fight. Scott attempted to stop the students, and one of the students involved in this action pushed Scott and left the area.
A videotape taken by a spectator seated in the west bleachers was admitted into evidence. The videotape showed approximately the final one-third of the fight. The videotape showed a violent fight where the participants were punching and kicking at each other, with no regard for the safety of individuals seated in the stands watching the game. The videotape also showed that spectators in the bleachers were scrambling to get away from the fight.
The following Monday, September 20, 1999, an investigation was begun by the administration at each high school to determine *817 who was involved in the fight. During the investigation, evidence was gathered which showed that each of the students was involved in the fight. Each student was suspended from school for 10 days pending further School Board action. Jim Thomas, principal of Stephen Decatur High School, recommended that Fuller and Bond be expelled for two years stating that the "severe nature of the infraction warrants the recommendation for expulsion." Scott recommended that Howell and Honorable be expelled for two years. Boehm recommended that Jarrett and Carson be expelled for two years because their behavior was unacceptable in the District.
On September 23, 1999, Kenneth Arndt (Arndt), Superintendent of Schools for the District, wrote a letter to the parent or guardian of each of the students. Each letter stated that a hearing had been set before a hearing officer, gave the date, time and location of the hearing, and stated that the parent or guardian and the student "are herewith requested to appear" at the scheduled hearing. The letter stated that "[y]ou are not required to attend, however, if you desire you may attend and also have an attorney and witnesses present."
The letter listed the provisions of the District's Student Discipline Policy and Procedures (Discipline Policy) each student was charged with violating. Each student was charged with violating: Rule 10, Gang-Like Activities; Rule 13, Physical Confrontation/Physical Violence with Staff or Students; and Rule 28, Any Other Acts That Endanger the Well-Being of Students, Teachers, or Any School Employee(s). A copy of these provisions was attached to each letter. The letter also stated that the administration was recommending that the student be expelled for two years. Each letter stated that the final decision on expulsion would be made by the School Board. The letter included the date and time of the special meeting of the School Board which had been set to consider the expulsion of each student. The evidence showed that the parent or guardian of each of the students received this letter prior to the hearing.
A separate hearing was held before Dr. David O. Cooprider (Dr. Cooprider) for each of the students. These hearings took place on September 27, 28 and 29, 1999. Dr. Cooprider was the Regional Superintendent for Macon and Piatt Counties until April 1999. He is currently one of the hearing officers under contract to conduct expulsion hearings for the District. At each hearing, a document was introduced into evidence which showed that each student had signed a form stating that he received a copy of the Discipline Policy. Evidence was also presented at each hearing regarding the involvement of that particular student in the fight. This evidence consisted of statements from eyewitnesses and testimony from school administrators regarding their investigation of the fight. The evidence at each of the hearings also included the testimony, report, or both, of Doug Taylor, a Decatur police officer assigned to Eisenhower High School as a police liaison officer, regarding his investigation of the fight. The evidence showed that each of the students was an active participant in the fight.
In addition, at most of the hearings, accident reports were made part of the record. These reports showed that seven bystanders were injured during the fight. These bystanders included six students at MacArthur High School and one adult. The injuries complained of were mainly bruises. However, a 15-year-old female student stated that people landed on her during the fight and when she got up to run she was kicked down by a person involved in the fight and heard her back pop. A 15-year-old male student complained that he was struck in the left cheek and suffered a contusion to his face.
Fuller, Honorable and Carson did not attend their hearings. In addition, no one attended the hearings on their behalf. Howell attended his hearing along with his mother, Cynthia Howell (Ms. Howell), and Theresa Gray of the NAACP. Jarrett and *818 his mother, Marilyn Jarrett, attended his hearing. Bond attended his hearing along with his guardian, Gretta Fuller (Ms. Fuller), and his uncle, Reverend Mark Bond (Reverend Bond). The students who attended their hearings were allowed to question witnesses and present testimony.
Dr. Cooprider prepared a Hearing Officer's Report regarding each of the students. The Report listed all persons who attended the hearing on behalf of the District and on behalf of the student. The Report also listed the exhibits entered into the record and summarized the testimony presented by each witness. Dr. Cooprider concluded, based upon the evidence presented at each hearing, that "there is ample evidence that the incident may fairly be characterized as violent physical confrontation, and certainly as actions which endangered students, school personnel, and school visitors." He also concluded that each of the six students was a significant participant in the September 17, 1999, incident. Accordingly, in each Report, Dr. Cooprider recommended that the student be expelled for two years.
On October 1, 1999, the School Board held a special meeting to consider the expulsion recommendation of Dr. Cooprider regarding Fuller and Jarrett. The School Board voted to go into closed executive session to discuss the student disciplinary cases. Two persons from the Rainbow/PUSH Coalition were allowed to address the Board during the closed session. The School Board then reviewed the video-tape of the fight at Eisenhower High School on September 17, 1999. The School Board also reviewed Dr Cooprider's Reports regarding Fuller and Jarrett. Fuller and his mother, Ms. Fuller, were present at the hearing and were allowed to address the School Board in closed session. Reverend Bond also addressed the School Board on behalf of Fuller. The School Board returned to open session and voted to expel Fuller for two years. In a separate vote, the School Board also voted to expel Jarrett for two years.
On October 4, 1999, the School Board held a special meeting to consider Dr. Cooprider's expulsion recommendation regarding Howell, Bond, Carson and Honorable. Again, the School Board voted to go into closed executive session to discuss the student disciplinary cases. In closed session, the School Board reviewed the videotape of the incident at the football game. Howell then was allowed to appear before the School Board with his mother, Ms. Howell, and Dr. Jeanelle Norman (Dr. Norman). They asked that Howell be allowed to withdraw from school. The School Board agreed to allow Howell to withdraw. A document was signed by Howell and Ms. Howell which stated that Ms. Howell was voluntarily withdrawing her son from school, in lieu of having an expulsion hearing.
Bond, his father, and a representative of the Rainbow/PUSH Coalition were allowed to address the School Board on behalf of Bond. No one appeared to speak on behalf of Carson or Honorable. The School Board reviewed Dr. Cooprider's Reports regarding Bond, Carson and Honorable. The School Board returned to open session and, in separate votes, voted to expel Bond, Carson and Honorable for two years. Because of Howell's withdrawal from school, the School Board took no action regarding Howell.
On November 8, 1999, School Board President Jacqueline Goetter (Goetter) and other representatives of the District, including Arndt, were involved in an eight-hour meeting with representatives of the Rainbow/PUSH Coalition and Governor George Ryan. The purpose of the meeting was to discuss the expulsions of the students. That evening, the School Board had a special emergency meeting to reconsider the length of the expulsion imposed on the students. Reverend Jesse Jackson was allowed to address the School Board. The School Board then went into closed executive session. After returning to open session, the School Board voted, in a separate vote for each student, to change the *819 length of the expulsions to the remainder of the 1999-2000 school year. Again, because of his withdrawal from school, no action was taken regarding Howell. The School Board discussed that, because of the action of Governor Ryan, the students would have the opportunity to attend an alternative education program immediately.
The students filed their original Complaint (# 1) in this court on November 9, 1999. The students also filed a Motion for Temporary Restraining Order or Preliminary Injunction (# 3). The students sought an Order reinstating them in school. As noted, the students' First Amended Complaint (# 29) was filed on November 30, 1999. In their First Amended Complaint, the students requested a permanent injunction allowing them to return to school as of January 2000 and a declaration that the "gang-like activities" provision in the Discipline Policy is void. Trial was held on December 27, 28, and 29, 1999, and the case is now before this court for decision.

ANALYSIS

I. PRELIMINARY MATTERS

A. LENGTH OF EXPULSION UNDER REVIEW
This court will not speculate as to what the outcome of this case would have been if the record had concluded following the October 1, 1999, and October 4, 1999, expulsion hearings when five of the students were expelled for two calendar years. Because of the efforts of the Rainbow/PUSH Coalition and the intervention of Governor George Ryan, the School Board reconsidered its decision and reduced the expulsions of the five students from two calendar years to the balance of the 1999-2000 school year. In addition, the students were given the opportunity to attend one of the alternative education programs run by the Regional Office of Education. According to Arndt and Goetter, because these alternative education programs are not run by the District, the School Board could not have provided the alternative education programs to the students without the intervention of Governor Ryan.
This court concludes that its inquiry and final decision in this case must be based upon the School Board's action on November 8, 1999, when the expulsions of the five students were reduced to a period of approximately eight months and the students were given the opportunity to enroll in an alternative education program. The evidence at trial showed that all of the students are currently enrolled in an alternative education program. Moreover, during trial, Arndt testified that two of the students who are seniors and need only a few credits to graduate may graduate with their class if they complete the necessary credits in the alternative education program. Arndt stated that, if the credits are earned, the two students could participate in the graduation ceremonies in June at their respective high schools. Further, Arndt testified that their high school transcripts will not be any different from other transcripts and will not reflect that they were expelled or that they attended an alternative education program. Arndt also testified that the other students will be allowed to re-enroll in their regular high schools at the end of the 1999-2000 school year. Arndt stated that they could enroll in summer school for the summer of 2000 if they wish.
Nevertheless, the students have persistently claimed in their pleadings that this case involves a two-year expulsion. That is incorrect. This court cannot enjoin enforcement of a penalty which is no longer in existence. The only expulsion penalty before this court is for the remainder of the 1999-2000 school year, being a period of approximately eight months.

B. EXPERT TESTIMONY OF DR. AMPREY
Defendants objected to the students calling as an expert witness Dr. Walter Amprey (Dr. Amprey), the former superintendent of the Baltimore, Maryland, *820 public schools. Defendants argued that Dr. Amprey's testimony was not admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). On December 28, 1999, this court held an extensive Daubert hearing and concluded that Dr. Amprey was qualified as an expert in the field of education. However, this court reserved ruling as to whether Dr. Amprey's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." See Fed.R.Evid. 702. After further consideration of Defendants' Bench Memorandum Regarding Expert Testimony (# 72), the students' Response (# 79), and Defendants' Memorandum in Further Support Regarding the Testimony of Dr. Amprey (# 85), this court has concluded that Dr. Amprey's testimony is admissible. Accordingly, Dr. Amprey's testimony has been considered by this court and was found to be candid and truthful.

C. GREGORY HOWELL
Defendants argue that Howell does not have standing to pursue this action as he has not suffered an injury which can be addressed by this court. This court agrees. Defendants note that the School Board took no action against Howell as he voluntarily withdrew from school. Defendants contend that, to have standing to bring a declaratory judgment action, a plaintiff must have sustained a real injury, fairly traceable to a defendant's conduct, which is likely to be redressed by the requested relief, citing Springfield Rare Coin Galleries, Inc. v. Johnson, 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300, 303 (1986). Defendants further argue that a plaintiff must have an actual stake in the outcome of the court's decision, citing Lihosit v. State Farm Mut. Auto. Ins. Co., 264 Ill.App.3d 576, 201 Ill.Dec. 193, 636 N.E.2d 625, 628 (1993). Again, the court agrees.
At trial, Ms. Howell testified that she went to Eisenhower High School on Saturday, September 25, 1999, to pick up the letter from Arndt which included the notice of Howell's hearing before Dr. Cooprider. Ms. Howell testified that Scott told her that her son was being expelled. She also testified that, on October 4, 1999, she attended the School Board meeting with Dr. Norman, the president of the NAACP in Decatur and a former member of the School Board. Ms. Howell testified that Dr. Norman suggested that she withdraw her son from school. Ms. Howell stated that she felt it was the only thing she could do because he was going to be expelled.
Based upon Ms. Howell's testimony, the students argue that Howell has standing to bring this lawsuit because his "voluntary" withdrawal from school was in fact coerced by the actions of Defendants. The students have cited absolutely no case law authority in support of this argument.
Scott testified that he did not tell Ms. Howell that her son was going to be expelled. He stated that he said nothing to Ms. Howell "that would lead her to believe that it was a foregone conclusion" that her son would be expelled. This court observed the manner and demeanor of Scott while he answered questions on the stand and finds his testimony to be credible. This court notes that Ms. Howell, her son and Theresa Gray from the NAACP did attend the hearing before Dr. Cooprider. Moreover, Ms. Howell and her son participated in the hearing extensively, asking many questions of the District's witnesses and presenting their own witnesses. Based upon the evidence, this court concludes that Ms. Howell asked the School Board to allow her son to withdraw from school based upon the advice she received from Dr. Norman. The court notes that the form signed by Ms. Howell and her son on October 4, 1999, included a hand-written notation that "The Board of Education is being requested not to take action on expulsion since this is a voluntary withdrawal." (Emphasis in original.)
Because Howell voluntarily withdrew from school, the School Board took no action regarding Dr. Cooprider's expulsion recommendation. Accordingly, there is no *821 expulsion decision of the School Board involving Howell for this court to enjoin or declare unconstitutional. Consequently, this court concludes that Howell lacks standing to be a Plaintiff in this case.

II. MERITS OF THE REMAINING FIVE STUDENTS' CLAIMS
On November 22, 1999, a hearing was held in this case, and the students requested additional time to file an amended complaint. At this hearing, the students agreed to consolidate their request for an injunction with a hearing on the merits of their claims pursuant to Rule 65 of the Federal Rules of Civil Procedure. Rule 65(a)(2) of the Federal Rules of Civil Procedure allows a judge to consolidate the hearing of a motion for a preliminary injunction with the trial on the merits if the parties consent. Proimos v. Fair Auto. Repair, Inc., 808 F.2d 1273, 1277-78 (7th Cir.1987). Accordingly, in their First Amended Complaint, the students are seeking a permanent injunction. The traditional standards for a permanent injunction are: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has an adequate remedy at law or will suffer irreparable harm without an injunction; (3) whether the balance of harms between the parties favors entering the injunction; and (4) whether the entry of the injunction will harm the public interest. Plummer v. American Institute of Certified Public Accountants, 97 F.3d 220, 229 (7th Cir.1996).
In determining whether the students have succeeded on the merits of their claims, this court is mindful that, as Plaintiffs, the students bear the burden of proving their claims. For that reason, the court gave the students wide latitude to fully present their evidence at trial. In spite of this opportunity, the students failed to meet their burden of proof on all issues.

A. LIMITED ROLE OF FEDERAL COURTS
At the outset, it is important to note that a federal court's role in school disciplinary matters is very limited. School discipline is an area which courts are reluctant to enter. Anita J. v. Northfield Township-Glenbrook North High School Dist. 225, 1994 WL 604100, at *2 (N.D.Ill.1994). The United States Supreme Court has stated:
It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. [Citations.] But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees. Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); see also Lamb v. Panhandle Community Unit School Dist. No. 2, 826 F.2d 526, 530 (7th Cir.1987); Parker by Parker v. Trinity High School, 823 F.Supp. 511, 521 (N.D.Ill.1993).
The Seventh Circuit recently noted that the Supreme Court "`has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" Boucher, 134 F.3d at 827 (quoting Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). In Boucher, the Seventh Circuit reversed an injunction granted by a district court which enjoined the school board from enforcing a one-year expulsion. The court stated, "[w]hile the district court's statement that a year's expulsion *822 is extreme is understandable, we cannot accept the conclusion that the harm the injunction imposes on the Board is insignificant." Boucher, 134 F.3d at 826. The court determined in that case, where the expelled student did not engage in any kind of violent activity, that the district court did not adequately consider the potential harm to the Board's authority to take disciplinary action for what it believed to be a serious threat to school property. Boucher, 134 F.3d at 826-27.
Moreover, the "right to an education [is] not guaranteed, either explicitly or implicitly, by the Constitution, and therefore could not constitute a fundamental right." Smith v. Severn, 129 F.3d 419, 429 (7th Cir.1997) (citing San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 35-37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)); see also Dunn v. Fairfield Community High School Dist. No. 225, 158 F.3d 962, 966 (7th Cir.1998). Accordingly, a challenge to a school disciplinary policy fails unless the policy is "wholly arbitrary." Dunn, 158 F.3d at 966. A successful substantive due process claim requires an "extraordinary departure from established norms." Dunn, 158 F.3d at 966. Because the right to an education is not a fundamental constitutional right, this court reviews the School Board's action to determine if it is an "exercise of governmental power without any reasonable justification." Dunn, 158 F.3d at 965. A court must look for an abuse of power that "shocks the conscience." Dunn, 158 F.3d at 965.
It is with this limited role in mind that this court reviews each of the students' claims.

B. PROCEDURAL DUE PROCESS
In their First Amended Complaint, the students alleged that their procedural due process rights were violated because the notice of the hearings was inadequate, they did not have an opportunity to confront their accusers and they were not informed of their appeal rights.
In Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court established that a student's right to a public education is a property interest protected by due process guarantees which cannot be taken away for misconduct without adhering to minimum procedures. See also Baxter v. Round Lake Area Schools, 856 F.Supp. 438, 443 (N.D.Ill.1994). The Seventh Circuit has determined that an expulsion hearing "need not take the form of a judicial or quasi-judicial trial." Linwood v. Board of Educ. of City of Peoria, School Dist. No. 150, 463 F.2d 763, 770 (7th Cir. 1972), cert. denied, 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972). Due process requires an opportunity to be heard in a meaningful manner. Linwood, 463 F.2d at 770. Accordingly, an expulsion hearing is sufficient to meet procedural due process requirements if the plaintiff knew the charges against him, received notice of the expulsion hearing, and was given a full opportunity to explain his position in an evidentiary hearing. See Betts v. Board of Educ. of City of Chicago, 466 F.2d 629, 633 (7th Cir.1972); Baxter, 856 F.Supp. at 444-45.
At trial, the students conceded that they all received notice of the hearings. However, Ms. Fuller testified that, prior to the hearing set for her son before Dr. Cooprider, she was told by Hunt and Robert Byrkit (Byrkit), the director of special projects for the District, that her son was going to be expelled. Ms. Fuller said that it was her understanding that it was a "foregone conclusion" that her son was going to be expelled so there was no point in taking off work to attend his hearing. During cross examination, Ms. Fuller further explained that she did not attend the hearing because she "had planned on just withdrawing him like Mrs. Howell and just letting him go to Springfield." Delphine Bond Kendrex (Ms. Kendrex), Bond's mother, testified that she spoke to Elmer McPherson (McPherson), assistant superintendent for the District, on September *823 27, 1999, prior to the date of the hearing set for Bond. Ms. Kendrex stated that McPherson told her that everybody involved in the fight would be expelled for two years. In addition, Carson's mother testified that an unnamed person told her that her son had been expelled. Based upon this testimony, the students argue that their due process rights were violated because their parents "were discouraged in pursuing the due process proceeding for their children."
This court initially notes that each of the students' parent or guardian received the September 23, 1999, letter from Arndt. The letters clearly stated that expulsion had been recommended but the decision on expulsion would be made by the School Board. Each letter also provided notice that two hearings were scheduled, one before the hearing officer and one before the School Board.
In addition, Hunt testified that he met with Ms. Fuller and told her it was imperative that she attend her son's hearing. Hunt also testified that he attempted to let her know that because of "the seriousness of the situation ... she needed to be there." Hunt further testified that he did not state or imply that she would be wasting her time to come to the hearing. Byrkit testified and corroborated Hunt's testimony. Byrkit stated that neither he nor Hunt told Ms. Fuller that her son was going to be expelled. The court observed the testimony of both Hunt and Byrkit and finds them to be credible witnesses.
The record is undisputed that Ms. Fuller, Bond's guardian, and Reverend Bond attended the hearing before Dr. Cooprider on behalf of Bond. Ms. Kendrex testified that she was in the building at the time of the hearing for Bond but did not go in because she "was in shock." In addition, Ms. Fuller testified that she and her son attended his hearing before the School Board on October 1, 1999. At that hearing, Fuller read a letter he had written to the School Board and asked for another chance. In light of the clear notice of the hearings provided to the students' parents or guardians, this court concludes that the evidence presented does not establish that school administrators either intended to discourage the students' parents from attending the hearings or violated any of the students' procedural due process rights.
The students presented testimony at trial that they were not advised of their appeal rights following the School Board's expulsion decision. Also, the students claimed the School Board did not listen to the tape of the hearings before Dr. Cooprider, look at the exhibits presented to the hearing officer, or request evidence from the students' files prior to voting on the expulsions. The students have provided this court with no case law supporting their argument that the School Board's failure to do any of the aforementioned acts violated their procedural due process rights. As previously noted, the case law is clear that an expulsion hearing is sufficient to meet the procedural due process requirements of the law if the plaintiff knew the charges against him, received notice of the expulsion hearing, and was given a full opportunity to explain his position in an evidentiary hearing. See Betts, 466 F.2d at 633; Baxter, 856 F.Supp. at 444-45.
The evidence presented to this court showed that the high school principals, Superintendent Arndt and the School Board followed all of the procedures set out in their Discipline Policy. By thoroughly completing these procedural steps, the School Board has sufficiently complied with the procedural due process requirements of the law.

C. EQUAL PROTECTION
The students have also alleged racial discrimination and a violation of their equal protection rights. The students alleged that the District has maintained a policy and practice of arbitrary and disparate expulsions with regard to African-American students.
*824 At the beginning of trial, the students asked the School Board to produce an "Expulsion Summary" which Arndt prepared for the School Board on October 5, 1999. This court ordered the School Board to produce this document, and it was introduced into evidence. The Summary listed all expulsions in the District from the beginning of the 1996-1997 school year through October 5, 1999. A newer version of the Summary was also admitted which had been updated to include two additional expulsions in 1999. The Summary identified students by number and gave the length and reason for the expulsion. The Summary did not include the race of any of the students. Arndt testified that racial information was not included in the Summary because the School Board did not request it. Arndt further stated that he was unable to obtain that information from the School Board's records because the race of students was never indicated at any time to the School Board. Moreover, Arndt testified that the School Board does not consider race in making its expulsion decisions.
However, at the students' request, this court ordered Arndt to review school records and, by any means available, to determine the race of each expelled student listed on the Summary. Overnight, Arndt complied with the court's order and added the race of each expelled student to the face of the document. This revised Summary was produced by Arndt in open court and was admitted into evidence. The Summary now showed that the majority of students expelled were African American. In fact, the Summary indicated that 82% of students expelled from the beginning of the 1996-1997 school year through December 1999, were African American. The remaining 18% of students expelled were Caucasian. The evidence at trial showed that African American students comprise approximately 46-48% of the student body in the District.
This court notes that the statistics produced during trial could lead a reasonable person to speculate that the School Board's expulsion action was based upon the race of the students. However, this court cannot make its decision solely upon statistical speculation. The court's finding must be based upon the solid foundation of evidence and the law that applies to this case.
This court reemphasizes the fact that the statistics presented at trial were created pursuant to this court's order. These statistics were never presented to the School Board at any time during the expulsion proceedings. In fact, information regarding the race of a student never appeared on the hearing officers' reports nor was the School Board ever advised of the race of any student facing expulsion. Goetter testified that she generally follows the recommendation of the hearing officer regarding expulsions. Jeffrey Perkins (Perkins), an African American member of the School Board, was called as a witness by the students. Perkins' testimony was both candid and credible. Perkins said that he "more often than not" followed the recommendation of the hearing officer regarding expulsions. Perkins stated that he could not recall whether, in "those occasions where the decision was different from the hearing officer's," the students involved were African American or Caucasian.
Perkins said that, at the October 1, 1999, School Board meeting, several members of the School Board indicated they believed the students were involved in gang activity based upon information received from law enforcement authorities. Perkins candidly admitted that he could not testify that race was "an issue in the decision to expel" the students in this case. Perkins stated that "clearly there was evidence to support physical confrontation in this situation" and that the students were eligible for expulsion under the Discipline Policy of the School Board. However, Perkins said he voted against the expulsions because he felt they were for too long a period of time. Perkins also candidly testified that white students had been expelled for fighting.
*825 Further, this court notes that both Perkins and Terry Robinson (Robinson) attended the November 8, 1999, School Board meeting. Perkins and Robinson were the only African American members of the School Board at the time in question. Both Perkins and Robinson voted against the expulsion of the students on November 8. Robinson was never called by the students to testify at trial as an adverse witness. As a consequence, no testimony was presented by either African American member of the School Board that the School Board's decision was racially motivated. Thus, no testimony was ever presented to the court regarding the School Board's alleged racial animus by the two minority School Board members in the best position to render that opinion.
The students assert that a "valid inference can be raised by large statistical disparities in racial situations including discipline that a given School District and/or School Board has discriminated intentionally." However, the cases cited by the students do not support this proposition. In fact, the law is clear that a claim of racial discrimination and violation of equal protection cannot be based upon mere statistics standing alone. Chavez v. Illinois State Police, 27 F.Supp.2d 1053, 1069 (N.D.Ill.1998). In United States v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), the United States Supreme Court concluded that a study which showed that most persons prosecuted for crack cocaine trafficking were black did not constitute some evidence tending to show the existence of the essential elements of a selective prosecution claim (a violation of equal protection). Armstrong, 517 U.S. at 470, 116 S.Ct. 1480. The Supreme Court held that, to "establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." Armstrong, 517 U.S. at 465, 116 S.Ct. 1480. Accordingly, the claim in Armstrong failed because the "study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." Armstrong, 517 U.S. at 470, 116 S.Ct. 1480. The decision in Armstrong is applicable to civil cases where plaintiffs claim discrimination on the basis of race. Chavez, 27 F.Supp.2d at 1066. In a race case, "plaintiffs must show that similarly situated individuals of a different race were not subjected to the challenged conduct." Chavez, 27 F.Supp.2d at 1066.
Here, in this case, the students have not even attempted to show that Caucasian students who engaged in similar conduct were not subjected to the same discipline. See Armstrong, 517 U.S. at 465, 116 S.Ct. 1480; Chavez, 27 F.Supp.2d at 1066. In fact, the Summary prepared by Arndt showed that Caucasian students had been expelled for physical confrontations or fighting. The length of these expulsions ranged from a period to five months to a period of one year, three months. Perkins' testimony confirmed that the School Board has expelled Caucasian students for fighting.
Moreover, none of the Caucasian students who were expelled for physical confrontations or fighting can be considered "similarly situated" to the students involved in this case. Arndt testified that no other fight listed in the Summary even came close to the magnitude of the September 17, 1999, fight. The videotape speaks volumes on this issue. Boehm testified that it was the only fight of this magnitude he had seen in 27 years in education. Accordingly, because the students failed to show that any similarly situated Caucasian students were treated less harshly, they failed to establish that race played any role in the School Board's expulsion decision.

D. ZERO TOLERANCE POLICY
In their Amended Complaint, the students alleged that the School Board's "no tolerance/zero tolerance policy for violence" violated their procedural and substantive due process rights.
*826 The evidence presented at trial does not support the students' claim. The evidence showed that, on August 25, 1998, the School Board adopted a resolution which stated that it joined other school districts, law enforcement and mental health agencies "in declaring a no-tolerance position on school violence, and encourages all citizens to make a commitment to violence-free schools." Arndt testified that this resolution was a political statement and had no impact on student expulsion cases. Arndt's testimony was corroborated by Perkins, the students' witness. Perkins testified that he voted in favor of the "notolerance" resolution on August 25, 1998. He testified that a resolution such as this does not have the same impetus or force as a policy. Perkins said he did not "spend a lot of time thinking about resolutions." Perkins further candidly and truthfully testified that he could not say that he thought about the August 25, 1998, resolution when he was voting on student expulsions. Most importantly, Perkins testified that he did not recall any discussion by the School Board about the resolution during any expulsion hearing. Moreover, Dr. Amprey, the students' expert witness, testified that he reviewed the documents related to the discipline of these students prior to trial. Dr. Amprey stated that, in reviewing all of the documents, he did not recall ever seeing the term "zero tolerance." He further stated that he had "come to know `zero tolerance' as a special approach or program either here or somewhere else ..., that would be a part of a, a philosophy and an organized approach as opposed to people just saying they have no tolerance for something."
From the testimony presented at trial, including the testimony of Dr. Amprey and School Board member Perkins, the court finds nothing in the record indicating that the August 25, 1998, resolution constituted a "zero tolerance policy."

E. GANG-LIKE ACTIVITY
The students also alleged that Rule 10, the provision prohibiting "gang-like activities" in the Discipline Policy, is void for vagueness and violates the due process guarantee of adequate notice of proscribed conduct. Rule 10 states:
As used herein, the phrase "gang-like activity" shall mean any conduct engaged in by a student 1) on behalf on any gang, 2) to perpetuate the existence of any gang, 3) to effect the common purpose and design of any gang and 4) or to represent a gang affiliation, loyalty or membership in anyway while on school grounds or while attending a school function. These activities include recruiting students for membership in any gang and threatening or intimidating other students or employees to commit acts or omissions against his/her will in furtherance of the common purpose and design of any gang.
At trial, Dr. Amprey testified that, in his opinion, "the rule in and of itself is subject to so many varied definitions of the term `gang' that renders itself, for lack of a better term, useless in the sense of clearly defining or of pointing out that someone is involved in gang activity." In addition, both Goetter and Arndt testified that definitions were not provided for the terms used in Rule 10. Relying on Stephenson v. Davenport Community School Dist., 110 F.3d 1303 (8th Cir.1997), and City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), the students contend that Rule 10 has serious constitutional deficiencies and is fatally vague on its face. The students argue that, because the School Board relied upon Rule 10 in its decision to expel them, the expulsions must be reversed.
Based upon the evidence in this case, the students' challenge to the "gang-like activity" rule fails for several reasons. Most importantly, this court notes that "`[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.'" Stephenson, 110 F.3d at 1308 (quoting Bethel School Dist. No. 403 v. *827 Fraser, 478 U.S. 675, 686, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)); see also Betts v. Board of Educ. of City of Chicago, 466 F.2d 629, 635 (7th Cir.1972); Linwood v. Board of Educ. of City of Peoria, School Dist. No. 150, 463 F.2d 763, 767 (7th Cir. 1972), cert. denied, 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972).
In Morales, defendants who were convicted of violating Chicago's gang loitering ordinance and were sentenced to jail terms appealed, arguing that the ordinance was unconstitutionally vague. The Illinois Supreme Court found that the ordinance was unconstitutionally vague, and the United States Supreme Court agreed and affirmed. Morales, 527 U.S. 41, 119 S.Ct. 1849, 1863, 144 L.Ed.2d 67 (1999). The Court stated that "the ordinance does not provide sufficiently specific limits on the enforcement discretion of the police `to meet constitutional standards for definiteness and clarity.'" Morales, 119 S.Ct. at 1863 (quoting City of Chicago v. Morales, 177 Ill.2d 440, 227 Ill.Dec. 130, 687 N.E.2d 53, 64 (1997)). However, the fact that the Supreme Court concluded that a gang loitering ordinance which imposes criminal sanctions is unconstitutional simply does not mean that a school disciplinary rule, even if similar, is likewise unconstitutional. As noted, a school disciplinary rule does not need to be as detailed as a statute or ordinance, which imposes criminal sanctions. See Fraser, 478 U.S. at 686, 106 S.Ct. 3159; Stephenson, 110 F.3d at 1308. Accordingly, the decision in Morales has no application to this case.
This court also concludes that the students' reliance on Stephenson is misplaced. In Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the United States Supreme Court cautioned courts to "examine the complainant's conduct before analyzing other hypothetical applications of the law." Hoffman Estates, 455 U.S. at 495, 102 S.Ct. 1186; see also Woodis v. Westark Community College, 160 F.3d 435, 438 (8th Cir.1998). This is because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to ... others." Hoffman Estates, 455 U.S. at 495, 102 S.Ct. 1186; see also Woodis, 160 F.3d at 438. Therefore, vagueness challenges which do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the disciplinary rule's facial validity. Woodis, 160 F.3d at 438-39. The students here have not, and cannot, argue that their involvement in a violent fight in any way implicates their First Amendment Rights. Consequently, before engaging in any analysis of the facial validity of Rule 10, this court must determine whether the students' conduct clearly violated the rule in question.
In each of the students' hearings before Dr. Cooprider, evidence was presented from Police Officer Doug Taylor. This evidence showed that an incident occurred on September 3, 1999, between two members of rival gangs, the Vice Lords and the Gangster Disciples. The evidence further showed that the fight on September 17, 1999, was a continuation of this incident and was a fight between members of these two rival gangs. Plaintiffs presented nothing at trial to contradict this evidence. Obviously, from this evidence, Dr. Cooprider and the School Board could clearly find that the students involved violated the prohibition against "gang-like activity." Here, unlike the situation in Stephenson, the evidence presented before Dr. Cooprider and the School Board showed that the students engaged in conduct that was clearly proscribed by Rule 10. Cf. Stephenson, 110 F.3d at 1305.[1] As *828 a result, the students cannot complain that Rule 10 may be vague as applied to others. See Woodis, 160 F.3d at 438-39.
Moreover, this court notes that the students were charged with violations of two other rules: Rule 13, prohibiting physical confrontation or violence with staff or students; and Rule 28, prohibiting any other acts that endanger the well-being of students, teachers or other school employees. Both of these rules state that a "recommendation for expulsion" may be made for a first or subsequent violation of the rule. The evidence clearly supported Dr. Cooprider's finding that "there is ample evidence that the incident may fairly be characterized as violent physical confrontation, and certainly as actions which endangered students, school personnel, and school visitors." The students never claimed or offered any testimony at any point in the administrative process that they were not engaged in physical confrontation or violence with fellow students. Nor was evidence presented denying that the conduct of the students in this case endangered the well-being of fellow students, teachers or other school employees. The students clearly violated these two rules and substantial evidence was presented in support of the School Board's action on these matters. The violation of these two rules alone would be a sufficient basis for the School Board to expel the students.

III. CONCLUSION
Based upon the foregoing analysis, this court concludes that the students have failed to meet the burden of proving their claims. Accordingly, the students are not entitled to a permanent injunction. See Plummer, 97 F.3d at 230. The students will remain expelled for the balance of the 1999-2000 school year. They may be readmitted beginning with summer school, June 2000.
IT IS THEREFORE ORDERED THAT:
(1) Judgment is entered in favor of Defendants and against the students on all counts of the students' First Amended Complaint.
(2) All motions shown as pending in this case (#3, #63, #76) are DENIED as moot.
(3) This case is terminated. The parties shall be responsible for their own court costs.
NOTES
[1] In Stephenson, a high school student was required to remove a small cross tattooed on her hand because school administrators considered it a "gang symbol." Therefore, in that case, because a cross can have many meanings, and can be a religious symbol, it was not clear that the student violated the rule prohibiting "gang symbols." The court concluded that the regulation prohibiting gang symbols was constitutionally infirm because it failed to provide adequate notice of the prohibited conduct. Stephenson, 110 F.3d at 1310.